**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **EUGENE BLAKE,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No. 2:08-0906** |
| **v.** | ) | |
| | ) | |
| **JAMES RUBENSTEIN, Commissioner,** | ) | |
| **West Virginia Division of Corrections,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

Pending before the Court are the following Motions: (1) Defendants Rubenstein, Ballard, Rider, and the Division of Corrections' Motion to Dismiss (Document No. 69), filed on December 23, 2008; (2) Defendants McGarry, Coleman, and Aramark's Motion to Dismiss (Document No. 108), filed on February 11, 2009; (3) Plaintiffs' Motion for Summary Judgment (Document No. 135), filed on April 6, 2009; (4) Plaintiff Lennis Angel's "Request to Withdraw From Above-Styled Case" (Document No. 139), filed on April 14, 2009; (5) Plaintiff Rose's Motion for Injunctive Relief (Document No. 168), filed on May 13, 2009; (6) Plaintiff Donald Wilson's Motion To Be Removed From Lawsuit (Document No. 211), filed on December 23, 2011; and (7) Plaintiff David Plumley's Motion to Withdraw (Document No. 217), filed on October 25, 2012.

<u>**PROCEDURAL AND FACTUAL BACKGROUND**</u>

On July 8, 2008, Plaintiffs, thirteen inmates at Mount Olive Correctional Complex ["MOCC"], filed a Complaint, an Affidavit and Exhibits. (Document No. 25.)[1] In their

---

[1] Because Plaintiffs are acting *pro se*, the documents which they have filed are held to a less

Complaint, Plaintiffs name the following entities and persons as Defendants: (1) West Virginia Department of Military Affairs & Public Safety, Division of Corrections[2] ["WVDOC"]; (2) James Rubenstein, Commissioner of the West Virginia Division of Corrections; (3) David Ballard, Warden of MOCC; (4) C.J. Rider, Religious Services Coordinator at MOCC; (5) Aramark Correctional Services ["Aramark"]; (6) Glen McGarry, Aramark; and (7) Keri Coleman, Aramark Supervisor. Citing 42 U.S.C. § 1983, Plaintiffs allege that by their actions and policies, Defendants have without any compelling or legitimate penological interest placed a substantial burden on their practice of the Hare Krishna religion in violation of the First, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and the Religious Land Use and Institutionalized Persons Act ["RLUIPA"] 42 U.S.C. §§ 2000cc- 2000cc-5 (Id., ¶¶ 9, 10, 21, 25, 26, 37 - 44, 75 - 101, 102.) Specifically, Plaintiffs claim that Defendants are acting in violation of their constitutional rights by the following:

(1)     not providing them with a diet prepared and served in conformity with their religious beliefs;[3]

(2)     denying or restricting their participation in Hare Krishna Sankirtana programs[4] and rehabilitative programs, deity puja[5], Ekadasi fast days[6] and

---

stringent standard than if they were prepared by a lawyer, and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

[2] The West Virginia Division of Corrections is a public safety division of the West Virginia Department of Military Affairs & Public Safety.

[3] The Hare Krishna prasadam diet is basically vegan and therefore includes various fruits, vegetables, nuts and grains and excludes all animal products (meat, poultry, seafood, eggs, dairy products, honey) and bi-products (gelatin, rennet, whey, etc.). Plaintiff's further contend that the Hare Krishna prasadam diet must be prepared by Hare Krishna devotees and consumed from trays with utensils which have not come in contact in any way with trays and utensils which have been exposed to animal products and/or bi-products.

[4] For Hare Krishna devotees, Hare Krishna Sankirtana programs involve chanting and singing the Mahamantra and studying and hearing stories from Hare Krishna scriptures.

2

celebration of holy days such as Janmastami while allowing Christian and Muslim programs including the Christian religious program of Kairos[7] and religious celebrations;

(3)     prohibiting their use of scented oils in their religious ceremonies;

(4)     not providing them with hygiene items containing no animal products;

(5)     not providing supplemental food items consistent with their religious beliefs in the MOCC commissary; and

(6)     not providing them with a place to display their religious books and literature.

Plaintiffs attach 26 Exhibits to their Complaint including documents indicating the agreement between the West Virginia Division of Corrections and Aramark respecting the provision of food services at West Virginia prison facilities, Hare Krishna religious statements and Plaintiffs' Affidavits including an Affidavit describing "substantial burdens" (Exhibit 20.). Plaintiffs request injunctive, declaratory and monetary relief.

On December 23, 2008, Defendants Rubenstein, Ballard, Rider, and the WVDOC filed their Motion to Dismiss and Memorandum in Support. (Document Nos. 69, 70, and 70-1.) Specifically, Defendants contend that Plaintiffs' claims should be dismissed based upon the following: (1) The "application of the legal doctrines of res judicata and collateral estoppel to the

---

[5] Deity puja involves the ritualistic invocation/worship of one or more deities. The image, usually a figurine or picture, of the deity is presented and prayers, chanting and offerings are made.

[6] Hare Krishna devotees engage in partial fasting twice a month on the days of Ekadasi and total fasting twice a year on the days of the two major Grand Celebrations. On Ekadasi days, they may eat fruits, vegetables and nuts and abstain from eating grains, beans, lentils and peas. On these latter days, the devotees engage in prayer, chanting and sacred readings.

[7] Kairos is a Christian prison ministry which offers programs in many prisons in the United States.

3

June 21, 2007, Dismissal Order of the Circuit Court of Kanawha County, West Virginia, operates to dismiss Plaintiffs' entire Complaint in this federal civil action" (Document No. 70, pp. 5 - 19.); (2) "Plaintiffs' 42 U.S.C. § 1983 claim against these Defendants should be dismissed with prejudice pursuant to the immunity afforded State entities and State officials by the Eleventh Amendment" (Id., pp. 19 - 24.); (3) "Defendants did not violate Plaintiffs' constitutional or statutory rights [under RLUIPA] by refusing to provide Plaintiffs with a prasadam diet" (Document No. 70, pp. 27 - 29 and Document No. 70-1, pp. 1 - 7.); (4) "Defendants did not violate Plaintiffs' constitutional [rights under the Establishment Clause] or statutory rights [under RLUIPA] by refusing to allow Plaintiffs' participation in all Ekadasi fast and holy days" (Document No. 70-1, pp. 7 - 10.); (5) "Defendants did not violate Plaintiffs' constitutional [rights under the Establishment Clause] or statutory rights [under RLUIPA] by refusing to provide Plaintiffs requisite commissary food items and forcing Plaintiffs to accept a diet co-payment for their food" (Id., pp. 11 - 14.); (6) "Defendants did not violate Plaintiffs' constitutional [rights under the Establishment Clause] or statutory rights [under RLUIPA] by refusing to allow Plaintiffs to have Hare Krishna Deity Puja with scented oil for worship" (Id., pp. 14 - 15.); (7) "Defendants did not violate Plaintiffs' constitutional [rights under the Establishment Clause] or statutory rights [under RLUIPA] by refusing to allow Plaintiffs to participate in Sankirtana rehabilitative programs" (Id., pp. 15 - 17.); (8) Defendants did not violate Plaintiffs' constitutional [rights under the Establishment Clause] or statutory rights [under RLUIPA] by refusing to allow Plaintiffs' miscellaneous requests for which they did not exhaust their administrative remedies" (Id., pp. 18 - 21.); (9) "Plaintiffs' claims against these Defendants should be dismissed with prejudice because Defendants did not engage in violation

of Plaintiffs' constitutional rights under the Fourteenth Amendment (Id., pp. 21 - 23.); and (10) "Plaintiffs' claims against these Defendants should be dismissed with prejudice because Defendants did not engage in cruel and unusual punishment in violation of Plaintiffs' constitutional rights under the Eighth Amendment" (Id., pp. 23 - 26.).

As Exhibits, Defendants attach the following: (1) A copy of the Complaint as filed on July 13, 2007, in Drescher v. Manchin, et al., Case No. 07-C-792 (Cir. Court Kanawha County) (Document Nos. 69-1 and 69-2); (2) A copy of Judge Tod J. Kaufman's "Dismissal Order" dated June 21, 2007, as filed in Drescher v. Manchin, et al., Case No. 07-C-792 (Cir. Court Kanawha County) (Document No. 69-3.); (3) The Affidavit of C.J. Rider (Document No. 69-4.); (4) A copy of pictures of the kitchen area (Document No. 69-5.); (5) A copy of the "Religious Services Schedule" and "MOCC TV Schedule for Religious Services" for December 2008 (Document No. 69-6.); (6) A copy of Plaintiff Jerry Rose's grievances (Document No. 69-7.); and (7) A copy of pertinent pages from "The Definitive Guide to Practicing Krishna Consciousness in Prison" as written by Mr. Thomas Drescher and issued by "The Prison Ministry of the International Society for Krishna Consciousness" (Document No. 69-8.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiffs on December 24, 2008, advising them of the right to file a response to the Defendants' Motion to Dismiss. (Document No. 73.) Plaintiffs filed their Response in Opposition on January 23, 2009. (Document No. 91-1.) Specifically, Plaintiffs argue as follows: (1) "Collateral estoppel and res judicata do not apply" (Id., pp. 2 - 8.); (2) Plaintiffs are entitled to relief under RLUIPA (Id., pp. 8 - 18.); (3) "Defendants are not entitled to immunity" (Id., pp. 18 - 23.); (4) Plaintiffs are entitled to relief based upon the denial of a prasadam diet (Id., pp. 23 - 64.); and (5) Plaintiffs

object to Defendant Rider's sworn affidavit (Id., pp. 64 - 66.).

As Exhibits, Plaintiffs attach the following: (1) A copy of a Memo to "All Prospective Vendors" from Warden Painter dated May 22, 2000, regarding Written Inquiry MOC 7129 (Document No. 91-3, pp. 2 - 7.); (2) A copy of the Aramark's Common Fare Menu (Id., pp. 8 - 15.); (3) A copy of the Aramark's Contract to provide food services to MOCC from August 1, 2007, until July 31, 2008 (Id., pp. 16 - 36.); (4) A copy of a Memo dated October 23, 2006, from Religious Services Coordinator C.J. Rider regarding "Ramadan Additional Fast" (Document No. 91-4, pp. 2 - 3.); (5) A copy of a Memo dated August 8, 2007, from Religious Services Coordinator C.J. Rider regarding "Ramadan 2007" (Id., pp. 4 - 7.); (6) A copy of a Memo dated October 17, 2006, from Chaplain Robert Van Rossen regarding "MOCC Kairos #10 Participants" (Id., p. 9.); (7) A copy of a Memo dated October 17, 2006, from Chaplain Robert Van Rossen to "Kitchen Workers - Kairo #10" regarding "Your Selection as a Kitchen Worker" (Id., p. 10.); (8) A copy of a Memo dated November 1, 2006, from Chaplain Robert Van Rossen to "Kairos #10 Graduates" regarding "Kairos Instructional Reunion" (Id., p. 11.); (9) A copy of the Declaration of Margurite Hull (Id., pp. 13 - 15.); (10) A copy of the Affidavit of Chandramauli Swami a.k.a. Frank Chiefa (Id., pp. 15 - 18.); (11) A copy of a letter dated October 28, 2006, addressed to Governor Joseph Manchin from Chandramauli Swami (Id., p. 19 - 21.); (12) A copy of a letter dated November 2, 2006, addressed to Chandramauli Swami from Governor Manchin (Id., p. 22.); (13) A copy of a Newsletter from the "ISKCON Prison Ministries Freedom Newsletter" dated "March/April 2007" (Document No. 91-5, pp. 2 - 7.); (14) A copy of an article entitled "California Agrees to Provide Kosher Prison Diet Program" from Prison Legal News dated July 2004 (Id., p. 9.); (15) A copy of an article entitled "When Does

6

Food Become Prasadam?" from "Back to Godhead" dated "January/February 2007" (Id., p. 11 - 15.); (16) A copy of scriptural excerpts from A.C. Bhaktivedanta Swami Folio (Id., pp. 16 - 31.); (17) A copy of the Ekadasi statement (Id., pp. 31 - 32.); (18) A copy of the 2008 Ekadasi Fast Days and Hare Krishna Holy Days (Document No. 91-6, pp. 1 - 13.); (19) A copy of an article entitled "A Devotee's Day in Court" (Id., p. 15.); (20) A copy of scriptural quotes from "The Nectar of Devotion" (Document No. 91-7, pp. 1 - 23.); (21) A copy of "Hare Krishna Scriptural Evidences" (Document No. 91-7, pp. 25 - 27 and Document No. 91-8, pp. 1 - 4.); (22) A copy of MOCC's "Operational Procedural # 5.08 Religious Programs" dated February 1, 2008 (Document No. 91-7, pp. 29 - 35.); (23) A copy of MOCC's "Operational Procedural # 4.20 Food Service" dated November 1, 2007 (Id., pp. 37 - 45.); (24) A copy of a letter dated January 8, 2007, addressed to Governor Manchin from Chandramauli Swami (Id., p. 46.); (25) A copy of a letter dated January 12, 2007, addressed to Chandramauli Swami from Governor Manchin (Id., p. 47.); (26) A copy of a letter dated January 17, 2007, from Commissioner Jim Rubenstein to Chandramauli Swami (Id., p. 48.); (27) A copy of Plaintiffs' "Affidavit Regarding the Hare Krishna Religion" (Id., pp. 6 - 19.); (28) A copy of Plaintiffs' "Affidavit Describing Substantial Burdens" (Id., pp. 20 - 41.); (29) A copy of Plaintiffs' "Affidavit Comparing Orthodox Kosher and Hare Krsna Prasadam Standards" (Document No. 91-9, pp. 1 - 3.); (30) A copy of Affidavits from Inmates Daniel Adams, Fredrico Hatcher, Kris Vanover, William Schwab, Roberty Roy, Russell Phillips, Terry Gill, John Price, William Cecil, Cornell Daye, David Plumley, Walter Swafford, Terry Gill, Yasser AbdelHaq, Thomas Luther, and Adam Cochran (Id., pp. 4 - 16, 20 - 30.); (31) A copy of a Memo dated December 10, 2008, from Sgt. Donald Slack to Inmate David Plumley regarding "Application for Special Diet Cook Position in MDR" (Id., pp. 17 - 18.); (32)

A copy of a Memo dated December 9, 2008, from Inmate David Plumley to Sgt. Donald Slack regarding a "Hare Krsna Cook" (Id., p. 19.); (33) A copy of Plaintiffs' Affidavit (Document No. 91-10, pp. 1 - 16.); (34) A copy of a "Swiss Food Products" label (Id., p. 18.); (35) A copy of 21 CFR § 139, "Macaroni and Noodle Products" (Id., pp. 21 - 39.); (36) A copy of "Mt. Olive Inmate Benefit Fund: Fund 6381 for the Period January 1, 2007 through May 28, 2008" (Id., pp. 41 - 49.); (37) A copy of an article entitled "The Dietary Laws: A Diet for the Soul" from the "The Dailey Way of Life" (Document No. 91-11.); (38) A copy of a "Special Religious Services" announce from the Religious Services Department dated July 8, 2008 (Document No. 91-12, pp. 1 - 3.); (39) A copy of the "Affidavit of Thomas A. Drescher" (Id., pp. 5 - 6.); (40) A of a letter dated October 19, 2007, addressed to Warden Ballard from Melanie L. Nagel, President of Serving America First (Id., p. 8.); (41) A copy of a Memorandum Order as filed on August 10, 1992, in Drescher v. West Virginia Dept. of Corrections, Case No. 92-C-48 (Cir. Ct. Marshall Co.) (Id., pp. 10 - 12.); (42) A copy of an Agreed Order as filed in Drescher v. West Virginia Dept. of Corrections, Case No. 92-C-48 (Cir. Ct. Marshall Co.) (Id., pp. 14 - 17.); (43) A copy of a letter from Thomas R. Tinder to Circuit Court Judge John T. Madden requiring the mediation results in Drescher v. West Virginia Dept. of Corrections, Case No. 92-C-48 (Cir. Ct. Marshall Co.) (Id., pp. 18 - 20.); (44) A copy of a pertinent section from 445 S.E.2d 730 (Id., p. 22.); (45) A copy of a Memo dated March 18, 2008, from Warden Ballard to Inmate Thomas Drescher regarding "Letters of Request" (Id., pp. 24 - 25.); (46) A copy of a Docket Sheet for Drescher v. Manchin, Case No. 07-C-792 (Cir. Ct. Kanawha Co.) (Id., p. 27.); (47) A copy of a letter dated February 5, 2008, to "Whom It May Concern" from Melanie Nagel, Malati Devi Dasi, of the New Vrindaban Community regarding Inmate Thomas Drescher (Id., p. 29.); and

(48) A copy of Memo dated October 11, 2006, from Warden McBride to Inmate Thomas Drescher regarding "Appeal: IG-06-433 and IG-06-434" (Id., p. 31.).

On January 28, 2009, Defendants Glen McGarry, Keri Coleman, and Aramark Correctional Services filed their Answer. (Document No. 94.) On February 3, 2009, Defendants Rubenstein, Ballard, Rider, and the WVDOC filed their "Reply to Plaintiffs' Response to Defendants' Motion to Dismiss." (Document No. 97.) As Exhibits, Defendants attach the following: (1) The Affidavit of David Ballard (Document No. 97-1, pp. 1 - 8.); (2) A copy of Aramark's Menu for the WV DOC for April 1, 2008 (Id., pp. 9 - 13.); (3) A copy of a Memo dated April 14, 2008, from Religious Services Coordinator C.J. Rider to Warden Ballard regarding "30-Day Religious Special Diet Review" (Id., pp. 15 - 16.); (4) A copy of "Aramark Correctional Services Medical Nutrition Therapy & Religious Meals Manual" (Id., pp. 18 - 26.); (5) A copy of a letter dated December 6, 2007, from Warden Ballard addressed to Melanie Nagel, President of Serving America First (Document No. 97-2.); (6) A copy of "Mount Olive Correctional Complex Religious Special Diet List Reviewed September 4, 2008" (Document No. 97-3.); (7) A copy of a Memo dated January 29, 2009, from Investigator Donnie Daniels to Executive Assistant Cheryl Chandler regarding alleged misconduct by Correctional Officer Lucinda Coleman (Document No. 97-4.); (8) A copy of MOCC's "Operational Procedure #5.08 Religious Programs" dated February 1, 2008 (Document No. 97-5.); (9) A copy of MOCC's "Operational Procedure #4.20 Food Service" dated February 1, 2008 (Document No. 97-6.); (10) A copy of "MOCC Post Order: 4C-05" to Food Service Staff dated April 1, 2008, regarding "Religious Special Diet Preparation and Serving Procedures" (Document No. 97-7.); (11) The Affidavit of Tim Wittington (Document No. 97-8.); (12) A copy of a Memo dated December 31,

2008, from Food Service Manager Keri K. Coleman to Executive Assistant Cheryl Chandler regarding Inmate Thomas Drescher (Document No. 97-9.); and (13) The Affidavit of C.J. Rider (Document No. 97-10.).

On February 6, 2009, Thomas Drescher filed a Motion for Leave to File a Surreply. (Document No. 102.) On February 9, 2009, Lennis Angel filed a Motion for Leave to File a Surreply. (Document No. 104.) Subsequently, Judge VanDervort denied the above Motions to File a Surreply. (Document No. 151.)

On February 11, 2009, Defendants McGarry, Coleman, and Aramark filed their Motion to Dismiss. (Document No. 108.) The above Defendants state that they incorporate "the arguments and authorities set forth in 'Defendants James Rubenstein, David Ballard, C.J. Rider, and the Department of Military Affairs & Public Safety Division of Corrections' Motion to Dismiss Plaintiff's Complaint' (Document No. 69) and the 'Memorandum of Law in Support.'" (Id.) Specifically, Defendants argue as follows: (1) "Plaintiffs' claims are barred by the application of *res judicata* and collateral estoppel to a June 21, 2007 Dismissal Order entered by Judge Tod Kaufman of the Circuit Court of Kanawha County, West Virginia;" (2) "[T]hese Defendants are entitled to the same immunity afforded the State entities and officials under W. Va. Code § 29-12A-5(b);" (3) "Plaintiffs have failed to allege facts demonstrating that the conduct and polices of the Defendants substantially burdened their religious activities in violation of 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, et seq.;" and (4) "Plaintiffs have failed to allege facts showing that their constitutional rights have been violated under the First, Fifth, Eighth, and Fourteenth Amendment of the United States Constitution." (Id.)

On February 18, 2009, Plaintiffs filed their Response in Opposition to Defendants McGarry, Coleman, and Aramark's Motion to Dismiss. (Document No. 112.) Plaintiffs state that they refute Defendants arguments and incorporate by reference their Response to Defendants Rubenstein, Ballard, Rider, and the WVDOC's Motion to Dismiss. (Id.) As Exhibits, Plaintiffs attach Amended Inmate Affidavits from Adam Cochran, Thomas A. Drescher, David Plumley, Daniel Adams, Yasser Abdelhaq, Kris Vanover, Fredrico Hatcher, Thomas Luther, Walter Swafford, Robert Roy, Terry Gill, Russell Phillips, William Schwab, Lennis Angel, Vern Hill, James Call, Richard Knotts, Charles B. Franklin, Jerry Rose, Charles F. Sergeon, and Russell Garrett. (Document No. 113.)

On April 6, 2009, Plaintiffs' filed their Motion for Summary Judgment and Memorandum in Support. (Document Nos. 135 and 136.) Plaintiffs contend that they are entitled to summary judgment based upon a May 1987, oral settlement agreement "between Hare Krishna practitioner Thomas Drescher and the Warden of the West Virginia State Penitentiary (WVP) at Moundsville." (Id.) Plaintiffs further contend that "[s]ince the oral settlement agreement was a legal contract, the Defendants are stopped by *res judicata* and collateral estoppel from asserting any claim or argument against these Plaintiffs." (Id.) Accordingly, Plaintiffs claim they are entitled to summary judgment. (Id.)

On April 7, 2009, Defendants Rubenstein, Ballard, Rider, and the WVDOC filed their Response is Opposition. (Document No. 138.) Defendants first argue that "there is no Court Order, Settlement Agreement or any other documentation that Plaintiffs have placed in the record to verify their contention that an oral settlement agreement was reached in 1987 or to establish what the terms of that alleged agreement were." (Id.) Second, Defendants note that

"Plaintiffs concede that they were not parties to this so-called oral settlement agreement." (Id.) Finally, Defendants note that Plaintiff Luther filed and signed the Motion for Summary Judgment on behalf of all Plaintiffs contrary to United States Magistrate Judge R. Clarke VanDervort's Order requiring all documents filed by Plaintiffs to be signed by each interested Plaintiff. (Id.)

As Exhibits, Defendants attach the following: (1) The Affidavit of C.J. Rider (Document No. 138-1); (2) A copy of "Mount Olive Correctional Complex Schedule For Religious Services in the Chapel: September 2007" (Document No. 138-2.); (3) A copy of "MOCC TV Schedule for Religious Services September 2007" (Document No. 138-3.); and (4) A copy of religious objects (Document No. 138-4.).

On April 14, 2009, Plaintiff Lennis Angel filed his "Request to Withdraw From Above-Styled Case." (Document No. 139.) In support of his request, Plaintiff Angel states that he is suffering from health problems, he cannot agree with co-plaintiffs as to how the case should proceed, and Defendants are retaliating against inmates due to the pending action. (Id.)

On April 15, 2009, Defendants McGarry, Coleman, and Aramark filed a Response to Plaintiffs' Motion for Summary Judgment. (Document No. 140.) The above Defendants state that they incorporate "the arguments and authorities set forth in 'Defendants James Rubenstein, David Ballard, C.J. Rider, and the Department of Military Affairs & Public Safety Division of Corrections' Response to Plaintiff's Motion for Summary Judgment' (Document No. 138)." Specifically, Defendants argue as follows: (1) "[T]here is no evidence of an oral settlement agreement between other non-party Hare Krishna devotees and the warden of the West Virginia Penitentiary at Moundsville in 1987;" (2) "There are no court documents from 1987 that

12

Plaintiffs have placed in the record to show that there was previous litigation or a judgment surrounding an alleged oral settlement agreement in 1987;" (3) "[A]n action for an alleged breach of contract occurring nearly two decades ago is barred by the statute of limitations found at W.Va. Code § 55-2-6;" and (4) "Plaintiffs have admitted that Thomas Drescher entered into written agreements after the alleged 1987 oral agreement, and in one of those agreements it is specifically stated that "[i]t is not necessary that petitioner prepare his own meals." (Id.)

Defendants Rubenstein, Ballard, Rider, and WVDOC filed their "Response to Plaintiff Lennis Angel's request to Withdraw" on April 29, 2009. (Document No. 153.) Defendants state that they do not object to Plaintiff's voluntary dismissal, but they do dispute the "erroneous and unsupported allegations against these Defendants." (Id.) In support Defendants, attach the following Exhibits: (1) The Affidavit of David Ballard (Document No. 153-1.); (2) A copy of the "West Virginia Division of Corrections Warden's Review and Decision of Administrative Segregation Committee's Initial Hearing Recommendation" regarding the Administrative Segregation Hearing/Review Decision concerning Eugene Blake (Document No. 153-2.); (3) A copy of an article from "The Register-Herald" dated February 19, 2009, entitled "Ohio looking to extradite inmate for 1982 murder"[8] (Document No. 153-3, pp. 1 - 2.); (4) A copy of an article from "The Register-Herald" dated March 5, 2009, entitled "Convicted killer sent to Ohio to face new charge" (Id., pp. 3 - 6.); and (5) A copy of the Writ and Warrant from Ohio (Id., pp. 5 - 6.).

On April 29, 2009, Plaintiff Blake filed his Second Motion to Amend. (Document No. 154.) Specifically, Plaintiff Blake requests that Fred Thompson, Allen Porter, and "Barb" (or Jane Doe) be added as defendants. (Id.) Plaintiff Blake filed his Reply to Defendants' "Response

---

[8]   The article involves Plaintiff Eugene Blake.

to Plaintiffs' Motion for Summary Judgment." (Document No. 159.) Defendants filed their "Response in Opposition to Plaintiff Blake's Motion for Leave to File Amended Complaint" on May 12, 2009. (Document No. 166.) On May 12, 2009, Plaintiff Rose filed his Amendment to his Motion for Injunctive Relief. (Document No. 168.) Plaintiff Blake filed his Amended Reply to Defendants' "Response to Plaintiffs' Motion for Summary Judgment" and Memorandum in Support on May 14, 2009. (Document Nos. 169 and 170.) On May 14, 2009, Plaintiffs Call, Garrett, Luther, Rose, Hill, Plumley, Franklin, Knotts, and Sergeon filed their Reply to Defendants' "Response to Plaintiffs' Motion for Summary Judgment." (Document Nos. 171 and 172.) As Exhibits, Plaintiffs attach the following: (1) The Affidavit of Wallace Sheffey (Document No. 171-1, pp. 1 - 2.); and (2) A copy of an article entitled "Drescher Will Cook Krishna's Meals" (Id., p. 3.).

On May 26, 2009, Defendants Rubenstein, Ballard, Rider, and the WVDOC filed a Motion to Strike Plaintiff Rose's Motion for Injunctive Relief. (Document No. 174.) On June 8, 2009, Plaintiff Rose filed a "Submitted as Stated" Statement in support of his Amended Motion for Injunctive Relief. (Document No. 176.) Defendants Rubenstein, Ballard, Rider, and the WVDOC filed a Motion to Strike Plaintiff Rose's "Submitted as Stated" Statement on June 10, 2009. (Document No. 177.) On June 19, 2009, Plaintiff Rose filed his Response to Defendant's Motion to Strike. (Document No. 178.) Defendants Rubenstein, Ballard, Rider, and the WVDOC filed their Reply to Plaintiff Rose's Response on June 19, 2009. (Document No. 179.)

On November 30, 2011, Plaintiff Rose filed a Motion for "Cease and Desist Order." (Document No. 207.) Defendants filed their Responses in Opposition on November 19, 2011. (Document Nos. 209 and 210.) On December 23, 2011, Plaintiff Donald Wilson filed a Motion

14

To Be Removed From Lawsuit. (Document No. 211.) Plaintiff David Plumley filed his Motion to Withdraw on October 25, 2012. (Document No. 217.)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's

claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## **DISCUSSION**

**1.     Motions for Voluntary Dismissal:**

Plaintiffs Lennis Angel, Donald Wilson, and David Plumley have failed Motions for Voluntary Dismissal. (Document Nos. 139, 211, and 217.) In support of his Motion, Plaintiff Angel states that he is suffering from health problems and a "conflict and irreconcilable difference have arisen between me and some of the co-plaintiffs." (Document No. 139.) Plaintiff Wilson states that "there is no need for him to be part of this civil lawsuit" because he "no longer practices the Hare Krishna religion." (Document No. 221.) Plaintiff Plumley states that he wishes to withdraw from the above action because he is "no longer a meaningful practitioner."

16

(Document No. 217.) In Response to Plaintiff Angel's Motion, Defendants state that they have no objection to the voluntary dismissal. (Document No. 153.)

Federal Rule of Civil Procedure 41(a)(1)(A)(i) provides that a plaintiff may voluntarily dismiss an action without a Court Order by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment[.]" Rule 41(a)(1)(B) states in pertinent part, as follows:

> Unless the notice of dismissal or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal – or state – court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

Rule 41(a)(2) of the Federal Rules of Civil Procedure provides that "[e]xcept as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." The purpose of the Rule respecting voluntary dismissal "is freely to allow voluntary dismissals unless the parties will be unfairly prejudiced." Davis v. USX Corp., 819 F.2d 1270, 1273 (4th Cir. 1987). "A plaintiff's motion under Rule 41(a)(2) should not be denied absent substantial prejudice to the defendant." Andes v. Versant Corp., 788 F.2d 1033, 1036 (4th Cir. 1986). It is well established that prejudice to the defendant does not result from the prospect of a second lawsuit. See Vosburgh v. Indemnity Ins. Co. of North America, 217 F.R.D. 384, 386 (S.D. W.Va. Sep. 12, 2003). In considering a Motion under Rule 41(a)(2), the District Court should consider the following relevant, but non-dispositive, factors: "(1) the opposing party's effort and expense in preparing for trial; (2) excessive delay or lack of diligence on the part of the movant; (3) insufficient explanation of the need for a dismissal; and (4) the present stage of the litigation, i.e., whether a motion for summary judgment is pending." Id.

In consideration of the above factors, the undersigned finds that Plaintiffs Angel, Wilson,

and Plumley's Motions for Voluntary Dismissal should be granted. A review of the record reveals that Defendants McGarry, Coleman, and Aramark have filed their Answer (Document No. 94.) and all Defendants have filed dispositive motions seeking the dismissal of Plaintiffs' Complaint (Document Nos. 69 and 108.). Defendants assert numerous grounds for dismissal. (Document No. 18.) In Plaintiff Angel's Motion for Voluntary Dismissal, Plaintiff states that a "conflict and irreconcilable difference have arisen between [him] and some of the co-plaintiffs." Plaintiffs Wilson and Plumley indicate that they no longer have an interest in the case because they are no longer of the Hare Krishna faith. Defendants filed a Response stating that they had no objection to Plaintiff Angel's Motion. The undersigned notes that none of the Defendants filed a Response opposing Plaintiffs Wilson and Plumley's Motions. At the present stage of the litigation, the undersigned finds that Defendants would not be unfairly prejudiced by the voluntary dismissal of Plaintiff's Complaint. As stated above, it is well established that prejudice to the defendant does not result from the prospect of a second lawsuit. Accordingly, the undersigned respectfully recommends that Plaintiffs Angel, Wilson, and Plumley's Motions requesting voluntary dismissal of this action be viewed under Federal Rule of Civil Procedure 41(a)(1)(A) and that the instant civil action be dismissed under Rule 41(a)(1)(A)(i) without prejudice. See e.g., Camacho v. Mancuso, 53 F.3d 48, 51 (4th Cir. 1995)(Rule 41(a)(1) "only allows a unilateral dismissal prior to a defendant's filing an answer to the complaint or filing a motion for summary judgment.")

2. **Plaintiffs' Motion for Summary Judgment**:

In their Motion for Summary Judgment, Plaintiffs contend that they are entitled to summary judgment based upon a May 1987, oral settlement agreement "between Hare Krishna

18

practitioner Thomas Drescher and the Warden of the West Virginia State Penitentiary (WVP) at Moundsville." (Document Nos. 135 and 136.) Specifically, Plaintiffs state that "[t]his oral settlement agreement sets precedent for future Hare Krishna practitioners to prepare all Hare Krishna meals in the WVP kitchen." (Id.) Plaintiffs contend that "[s]ince the oral settlement agreement was a legal contract, the Defendants are stopped by *res judicata* and collateral estoppel from asserting any claim or argument against these Plaintiffs." (Id.) Accordingly, Plaintiffs contend they are entitled to summary judgment. (Id.)

In Response, Defendants Rubenstein, Ballard, Rider, and the WVDOC first argue that "there is no Court Order, Settlement Agreement or any other documentation that Plaintiffs have placed in the record to verify their contention that an oral settlement agreement was reached in 1987 or to establish what the terms of that alleged agreement were." (Document No. 138.) Defendants note that "Plaintiffs concede that they were not parties to this so-called oral settlement agreement." (Id.) Defendants further state that West Virginia Division of Corrections has not "confirmed that an oral agreement was made with Thomas Drescher or other Hare Krishna inmates back in 1987." (Id.) Next, Defendants assert that Plaintiffs cannot establish "(1) who the parties were to this alleged oral agreement, (2) whether there was an offer and acceptance (i.e. whether there was a meeting of the minds on the terms of the agreement), and (3) what the terms of the agreement actually were." (Id.) Third, Defendants argue that Thomas Drescher's alleged 1987 oral settlement agreement could not have been incorporated within the 1982 Consent Degree in Crain v. Bordenkircher, 76 W.Va. 338, 341, 342 S.E.2d 422, 425-26 (1986). (Id.) Fourth, Defendants claim that collateral estoppel cannot apply because "there are no court documents from 1987 that Plaintiffs have placed in the record to show that there was

previous litigation or a judgment surrounding the supposed oral settlement agreement." (Id.) Although Defendants acknowledge a settlement agreement with Mr. Drescher in 1992 and 1999, Defendants note that neither settlement agreement provided that Mr. Drescher would be permitted to prepare his own meals. (Id.) Finally, Defendants note that Plaintiff Luther filed and signed the Motion for Summary Judgment on behalf of all Plaintiffs contrary to Judge VanDervort's Order requiring all documents filed by Plaintiffs to be signed by each interested Plaintiff. (Id.)

In Response, Defendants McGarry, Coleman, and Aramark state that they incorporate "the arguments and authorities set forth in 'Defendants James Rubenstein, David Ballard, C.J. Rider, and the Department of Military Affairs & Public Safety Division of Corrections' Response to Plaintiffs' Motion for Summary Judgment' (Document No. 138)." (Document No. 140.) Specifically, Defendants argue as follows: (1) "[T]here is no evidence of an oral settlement agreement between other non-party Hare Krishna devotees and the warden of the West Virginia Penitentiary at Moundsville in 1987;" (2) "There are no court documents from 1987 that Plaintiffs have placed in the record to show that there was previous litigation or a judgment surrounding an alleged oral settlement agreement in 1987;" (3) "[A]n action for an alleged breach of contract occurring nearly two decades ago is barred by the statute of limitations found at W.Va. Code § 55-2-6;" and (4) "Plaintiffs have admitted that Thomas Drescher entered into written agreements after the alleged 1987 oral agreement, and in one of those agreements it is specifically stated that "[i]t is not necessary that petitioner prepare his own meals." (Id.)

Plaintiffs first contend that they are entitled to summary judgment on the issue of preparation of meals by Hare Krishna devotees based upon the alleged 1987 oral settlement

20

agreement between Mr. Drescher and the Warden of West Virginia State Penitentiary at Moundsville. The undersigned finds that Plaintiffs' above claim is without merit. First, the record is void of any evidence supporting Plaintiffs' claim that such an oral agreement was ever reached. If such a settlement agreement was reached, Plaintiffs further fail to produce any evidence as to the content of the settlement agreement. Next, Plaintiffs concede that they were not a party to the alleged settlement agreement between Mr. Drescher and the Warden.[9] Thus, Plaintiffs' conclusory claim that they are entitled to summary judgment based upon an alleged oral settlement agreement to which they were not a party to is without merit. Finally, the undersigned finds that even if an oral settlement agreement existed, Plaintiffs are not entitled to summary judgment based upon collateral estoppel. Collateral estoppel "precludes relitigation of an issue decided previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding." In re McNallen, 62 F.3d 619, 624 (4th Cir. 1995). The doctrine of collateral estoppel applies if the following elements are satisfied: (1) "the issue sought to be precluded is identical to one previously litigated;" (2) "that the issue was actually determined in the prior proceeding;" (3) "that the issue's determination was 'a critical and necessary part of the decision in the prior proceeding;" (4) "that the prior judgment is final and valid;" and (5) "that the party against whom collateral estoppel is asserted 'had a full and fair opportunity to litigate the issue in the previous forum." Collins v. Pond Creek Mining Co., 468 F.3d 213 (4th Cir. 2003)(citation omitted). In the instant case, Plaintiffs cannot satisfy the fourth element showing

---

[9]    In response to Defendants' Motion to Dismiss based upon *res judicata*, Plaintiffs state that they were not practitioners of the Hare Krishna religion when Drescher filed his original complaint in West Virginia state court in 2007." Thus, it does not appear that Plaintiffs were Hare Krishna devotees in 1987.

that there was a prior judgment that was final and valid. Accordingly, Plaintiffs are not entitled to summary judgment based upon collateral estoppel. Based upon the foregoing, the undersigned respectfully recommends that Plaintiffs' Motion for Summary Judgment be denied.

**3.    Converting Defendants' Motions to Dismiss:**

"In addressing a motion to dismiss, the court may consider a plaintiff's factual allegations made in the complaint, any exhibits attached thereto, documents attached to the motion to dismiss that are authentic and integral to the complaint, and any matters of public record of which the court may take judicial notice." McDowell v. Town of Sophia, 2012 WL 3778837 (S.D.W.Va. Aug. 30, 2012)(J. Berger)(citations omitted); also see Wittholh v. Federal Insurance Co., 164 Fed.Appx. 395, * 1 (4th Cir. 2006)(when considering a motion to dismiss, "a court may consider official public records"); Pueschel v. United States, 369 F.3d 345, 354 n. 3 (4th Cir. 2004)("If, on a motion . . . to dismiss . . . matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"); American Chiropractic Association v. Trigon Health Care, Inc., 367 F.3d 212, 234 (4th Cir. 2004)("[W]hen a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and if the plaintiff's do not challenge its authenticity."). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

In their Motion to Dismiss, Defendants attach Affidavits and documents outside

pleadings. (Document No. 69.); See Zavolta v. Henderson, 2011 WL 1790492, * 2 (N.D.W.Va. May 10, 2011)("Affidavits are document outside the pleadings and this Court must convert the motion to dismiss to a motion for summary judgment if it is to consider the . . . affidavits.") Thus, the Court must consider whether Plaintiffs "should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." In re G. & A. Books, Inc., 770 F.2d 288, 295 (2nd Cir. 1985). In the instant case, it appears that Plaintiffs recognized that the motion might be converted into one for summary judgment. Plaintiffs filed 49 exhibits, which consist of nearly 400 pages of documents, in support of their Response to Defendants' Motions to Dismiss. (Document Nos. 91-3, 91-4, 91-5, 91-6, 91-7, 91-8, 91-9, 91-10, 91-11, 91-12 and 113.) Plaintiffs' Exhibits also consist of numerous affidavits and documents outside the pleadings. The undersigned, therefore, finds that Plaintiffs were given a reasonable opportunity to present all the material that was pertinent to the motion and not deprived of a reasonable opportunity to meet facts outside the pleadings. Accordingly, the undersigned finds that Defendants' Motions to Dismiss should be construed as Motions for Summary Judgment.

**4.** _**Res Judicata**_ **and Collateral Estoppel:**

In their Motions, Defendants first argue that the "application of the legal doctrines of _res judicata_ and collateral estoppel to the June 21, 2007, Dismissal Order of the Circuit Court of Kanawha County, West Virginia, operates to dismiss Plaintiffs' entire Complaint in this federal civil action." (Document No. 70-1, pp. 5 - 19.) Defendants state that Inmate Thomas A. Drescher, a Hare Krishna devotee, filed a civil action in the Circuit Court of Kanawha County,

West Virginia, in 2007 essentially alleging the same claims as Plaintiffs allege herein and in June, 2007, Circuit Judge Kaufman dismissed the case finding that Mr. Drescher's constitutional and RLUIPA rights were not violated. (Id.) Defendants therefore assert that in view of Circuit Judge Kaufman's findings, Plaintiffs' claims herein are barred by operation of the doctrine of *res judicata* and collateral estoppel. (Id.)

In Response, Plaintiffs argue that "[c]ollateral estoppel and *res judicata* do not apply." (Id., pp. 91-1, pp. 2 - 8.) Plaintiffs contend that "Drescher's complaint was dismissed by Judge Kaufman for lack of jurisdiction prior to service on defendants." (Id., pp. 2 - 3.) Thus, Plaintiffs argue that "collateral estoppel and *res judicata* do not apply since a dismissal for lack of jurisdiction preempts the application of *res judicata* and collateral estoppel." (Id., p. 4.) Plaintiffs further argue that "upon a careful reading of the Complaints of Drescher and those of Blake it becomes clear that while the general nature of the violations indeed precipitate from a common cause, they each involve different scenarios, events, transactions and players arising from entirely separate violations that arise from different events and transactions and series of events and transactions." (Id., p. 3.) Plaintiffs state "with the sole exception of Plaintiff David Plumley, the remaining twelve (12) Plaintiffs in this case were not practitioners of the Hare Krishna religion when Drescher filed his original complaint in West Virginia state court in 2007." (Id.) Third, Plaintiffs argue that Judge Kaufman did not dismiss Drescher's Complaints on the merits of his claim. (Id., p. 6.)

In Reply, Defendants continue to argue that Plaintiffs' Complaint should be dismissed based upon *res judicata* and collateral estoppel. (Document No. 97, pp. 1 - 6.) Defendants argue that "[a]lthough Judge Todd Kaufman concluded that he did not have jurisdiction to hear a case

24

based upon 42 U.S.C. § 1983 claim, he did determine that Drescher's claims of religious discrimination pursuant to the United States Constitution and West Virginia Constitution were within the jurisdiction of the Court." (Id., pp. 1- 2.) Defendants claim that "[a] review of Judge Kaufman's Dismissal Order will show that he did, in fact, consider all of Drescher's claimed violations under the First, Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution." (Id., p. 2.) Next, Defendants argue that Drescher's State Complaint and Plaintiffs' federal Complaint raise the exact same claims: "Drescher and these Plaintiffs claim to be entitled to declaratory, injunctive and compensatory relief authorized by 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc et seq. (2000) to redress the deprivation, under color of state law, of rights secured by the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, §§ 5 and 10 of the West Virginia Constitution." (Id., p. 3.) Third, Defendants argue that Drescher is in privity with the Plaintiffs because (1) "Drescher is an inmate at [MOCC] who is a practicing Hare Krishna devotee asserting the right to religious accommodations," and (2) "Drescher is serving as Plaintiffs' next friend in this lawsuit, acting on their behalf." (Id.) Defendants argue that they are in privity with the defendants from Drescher's suit because (1) Defendants Rubenstein and Rider were defendants in both suits; (2) Defendant Ballard is the current Warden of MOCC and is in privity with former Warden McBride, who was sued by Drescher; and (3) WVDOC "is also in privity with the defendants from Mr. Drescher's suit." (Id., pp. 3 - 4.) Defendants argue that Judge Kaufman's dismissal of Drescher's Complaint was on the merit because the Complaint was dismissed for failure to state a claim. (Id., p. 4.)

The preclusive effects of the doctrines of *res judicata* and collateral estoppel are designed to promote judicial economy, encourage reliance on judicial decisions, and relieve parties from

the expense of multiple lawsuits. See Parklane Hosiery Co. Inc. v. Shore, 439 U.S. 322, 326, 99, S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); Wright & Miller, § 131.12[4][a]. "Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." Young-Henderson v. Spartanburg Area Mental Health Center, 945 F.2d 770, 773 (4th Cir. 1991)(quoting, Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Collateral estoppel "precludes relitigation of an issue decided previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding." In re McNallen, 62 F.3d 619, 624 (4th Cir. 1995). The doctrine of res judicata applies if the following elements are satisfied: "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and present suit; and (3) an identity of the parties or their privies." Pueschel v. U.S., 369 F.3d 345, 354-55 (4th Cir. 2004). The doctrine of collateral estoppel applies if the following elements are satisfied: (1) "the issue sought to be precluded is identical to one previously litigated;" (2) "that the issue was actually determined in the prior proceeding;" (3) "that the issue's determination was 'a critical and necessary part of the decision in the prior proceeding;" (4) "that the prior judgment is final and valid;" and (5) "that the party against whom collateral estoppel is asserted 'had a full and fair opportunity to litigate the issue in the previous forum." Collins v. Pond Creek Mining Co., 468 F.3d 213 (4th Cir. 2003)(citation omitted). The Court will consider the above-referenced elements in determining whether the prior judgment entered by the Circuit Court of Kanawha County precludes Plaintiffs' claims against Defendants.

      First, the undersigned will consider whether Plaintiffs were in privity with the plaintiff

(Thomas Drescher) in the <u>Drescher</u> case. To be in privity with a party to a previous litigation, the nonparty must be "so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved." <u>Jones v. SEC</u>, 115 F.3d 1173, 1180 (4th Cir. 1997)(<i>citing</i>, <u>Nash County Board of Education v. Biltmore Co.</u>, 640 F.2d 484, 493 (4th Cir. 1981). Since the <u>Drescher</u> case occurred in a West Virginia court, it is a question of West Virginia law as to whether the Plaintiffs in the instant case are in privity with Mr. Drescher. "[T]he concept of privity with regard to the issue of claim preclusion is difficult to define precisely but the key consideration for its existence is the sharing of the same legal right by parties allegedly in privity, so as to ensure that the interest of the party against whom preclusion is asserted have been adequately represented." <u>West Virginia Human Rights Community v. Esquire Group, Inc.</u>, 217 W. Va. 454, 618 S.E.2d 463 (2005). "To determine whether two parties are in privity, the relevant question is whether it is proper for one to be bound by the prior judgment against the other." <u>Id.</u>(<i>citing</i>, <u>Rowe v. Grapevine Corp.</u>, 206 W.Va. 703, 715, 527 S.E.2d 814 (1999)). "[P]reclusion is fair so long as the relationship between the nonparty and a party was such that the nonparty had the same practical opportunity to control the course of the proceedings that would be available to a party." <u>Gribben v. Kirk</u>, 195 W.Va. 488, 499, 466 S.E.2d 147 (1995). The Court notes that "an extreme application of res judicata to non-parties may violate due process." <u>Harrison v. Burford</u>, 2012 WL 2064499 (S.D.W.Va. June 7, 2012)(J. Goodwin)(<i>citing</i>, <u>Richards v. Jefferson County</u>, 517 U.S. 793, 796, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996).

The Court finds that the relationship between Plaintiffs and Mr. Drescher is not close enough to include Plaintiffs within the <i>res judicata</i>. Although Defendants note that Mr. Drescher

is acting as a next friend on Plaintiffs' behalf in the instant case, the undersigned notes that Judge VanDervort entered an Order denying Mr. Drescher's request to act as a next friend for Plaintiffs. (Document No. 99 and 151.) Judge VanDervort specifically determined Mr. Drescher could not appear in a representative capacity on Plaintiffs' behalf and the Court would not consider any documents filed by Mr. Drescher on Plaintiffs' behalf. (Id.); See Barnett v. Commtec/Pomeroy Computer Resources, Inc., 439 F.Supp.2d 598 (S.D.W.Va. July 20, 2006)(J. Goodwin)(A plaintiff cannot be in privity with a party that had no authority to bring suit on behalf of him). Further, Plaintiffs argue that Mr. Plumley was the only one out of thirteen Plaintiffs that was a Hare Krishna at the time of the Drescher case. At the time of the Drescher decision, twelve of the thirteen Plaintiffs were not suffering from the alleged violations of their constitutional and statutory rights. See Jones v. McAndrew, 996 F.Supp. 1439 (N.D.Fl. Feb. 20, 1998)(rejecting defendants' argument that privity refers to the relationship between the current party and the "subject matter of the [prior] litigation"). The undersigned, therefore, finds that the relationship between Mr. Drescher and Plaintiffs was not close enough to establish privity between the parties for purposes of *res judicata*.

Next, the undersigned will consider whether the claims against Defendants are precluded by collateral estoppel. Unlike *res judicata*, "[c]ollateral estoppel . . . does not always require that the parties be the same. State v. Miller, 194 W.Va. 3, 9, 459 S.E.2d 114 (1995). Due process, however, "requires that 'any person against whom collateral estoppel is asserted must have had a prior opportunity to have litigated his claim.'" Harrison, 2012 WL 2064499, * 8(citing Conley v. Spillers, 171 W.Va. 584, 301 S.E.2d 216 (1983)). For the reasons stated above, the undersigned finds that Plaintiffs did not have a prior opportunity to litigate their claims. Specifically, at the

28

time of the <u>Drescher</u> decision, twelve of the thirteen Plaintiffs were neither interested nor suffering from the alleged violations of their constitutional and statutory rights. Thus, Plaintiffs did not have an opportunity or interest in litigating their claims at the time of the <u>Drescher</u> decision. Based upon the foregoing, the undersigned respectfully recommends that the District Court deny Defendants' Motions based upon *res judicata* and collateral estoppel.

**5.     Immunity:**

In their Motions, Defendants first argue that Plaintiffs' claim against the Department of Military Affairs & Public Safety Division of Correction must fail because of the immunity bar of the Eleventh Amendment and the State is not a "person" within the meaning of Section 1983. (Document No. 70, pp. 19 - 23.) Second, Defendants argue that Defendants Rubenstein, Ballard, and Rider are entitled to be dismissed to the extent they are being sued in their official capacities. (<u>Id.</u>, pp. 23 - 24.) Third, Defendants McGarry, Coleman, and Aramark argue they "are entitled to the same immunity afforded the State entities and officials under W. Va. Code § 29-12A-5(b)." (Document No. 108.)

In Response, Plaintiffs argue that Defendants are not entitled to immunity. (<u>Id.</u>, pp. 91-1, pp. 18 - 23.) Plaintiffs argue that "state officials can be sued in their individual capacities and be held personally liable under § 1983 if it can be shown that the official, acting under color of state law, caused the deprivation of a federal right." (<u>Id.</u>) Plaintiffs further argue that municipalities and local governmental bodies are "persons" under Section 1983. (<u>Id.</u>)

In Reply, Defendants continue to argue that Plaintiffs' Complaint should be dismissed based upon immunity. (Document No. 97, pp. 6 - 8.) First, Defendants argue that "there are not municipalities or local governmental bodies." (<u>Id.</u>) Defendants explain that they "are a State

entity and employees of the State." (Id.) Defendants claim that the "Department of Military Affairs & Public Safety, Division of Corrections, is an appendage of the State of West Virginia." (Id.) Defendants assert that Defendants Rubenstein, Ballard, and Rider are indistinguishable from the State itself." (Id.) Therefore, Defendants contend that they are not "persons" within the meaning of Section 1983. (Id.)

**A.      Department of Military Affairs & Public Safety Division of Corrections:**

It is well recognized that a Section 1983 claims must be directed at a "person." See Preval v. Reno, 203 F.3d 821 (4th Cir. 2000)(unpublished)(finding that the Piedmont Regional Jail is not a "person" under Section 1983); Roach v. Burch, 825 F.Supp. 116, 117 (N.D.W.Va. 1993)(stating that the West Virginia Regional Jail Authority is not a "person" under Section 1983); also see Will v. Michigan Dept. of State Police, 491 U.S. 58, 66, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989)(Suits against a state or state agencies for monetary damages are barred by the Eleventh Amendment to the United States Constitution); Webb v. Parsons, 2011 WL 2076419 (S.D.W.Va. May 6, 2011)(finding that the West Virginia Regional Jail Authority, an agency of the State of West Virginia, is immune from suit under the Eleventh Amendment). Accordingly, the undersigned finds that the Department of Military Affairs & Public Safety Division of Corrections is not a "person" as required by Section 1983.

**B.      Official Capacity Claims Against Defendants:**

Suits against a state or state agencies for monetary damages are barred by the Eleventh Amendment to the United States Constitution.[10] See Will v. Michigan Dept. of State Police, 491

---

[10] The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

U.S. at 66, 109 S.Ct. at 2309. The Eleventh Amendment protects states from being sued in federal court on the basis of state law. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 117, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); Westinghouse Elec. Corp. v. West Virginia Dept. of Highways, 845 F.2d 468, 470 (4th Cir.), cert. denied, 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 116 (1988). The Eleventh Amendment immunity not only applies to states and state agencies, but extends to suits filed against state officials when "the relief sought and ordered has an impact directly on the State itself." Pennhurst, 465 U.S. at 117, 104 S.Ct. at 917. See also, Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996)("This immunity extends to 'arm[s] of the State,' (citations omitted) including state agencies and state officers acting in their official capacity. (citations omitted)). To the extent Plaintiff seeks monetary damages from Defendants in their official capacities, the undersigned finds that Plaintiff's claims are barred by the Eleventh Amendment and should be dismissed.

**6.      Exhaustion of Administrative Remedies:**

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)(1996), requires that inmates exhaust available administrative remedies prior to filing civil actions though the administrative process may not afford them the relief they might obtain through civil proceedings.[11] Woodford v. Ngo, 548 U.S. _81, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006); Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)(The Prison Litigation Reform Act's exhaustion requirement applies to all inmate suits about prison life whether they involve general

---

[11] 42 U.S.C. § 1997e(a) provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title or any other federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted.

circumstances or particular episodes and whether they allege excessive force or some other wrong.); Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819, 1820,149 L.Ed.2d 958 (2001)("Under 42 U.S.C. § 1997e(a), an inmate seeking only money damages must complete any prison administrative process capable of addressing the inmate's complaint and providing some form of relief, even if the process does not make specific provision for monetary relief."). Exhaustion of administrative remedies is also required when injunctive relief is requested. Goist v. U.S. Bureau of Prisons, 2002 WL 32079467, *4, fn.1 (D.S.C. Sep 25, 2002), aff'd, 54 Fed.Appx. 159 (4th Cir. 2003), cert. denied, 538 U.S. 1047, 123 S.Ct. 2111, 155 L.Ed.2d 1088 (2003). "[T]here is no futility exception to the PLRA's exhaustion requirement." Massey v. Helman, 196 F.3d 727, 733 (7th Cir. 1999). But the plain language of the statute requires that only "available" administrative remedies be exhausted. A grievance procedure is not "available" if prison officials prevent an inmate from using it. Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)(inmate lacked available administrative remedies for exhaustion purposes where inmate was unable to file a grievance because prison officials refused to provide him with the necessary grievance forms); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001)(allegations that prison officials failed to respond to his written requests for grievance forms were sufficient to raise an inference that inmate had exhausted his available administrative remedies.)

If an inmate exhausts administrative remedies with respect to some, but not all, of the claims he raises in a Section 1983, Bivens or FTCA action, the Court must dismiss the unexhausted claims and proceed with the exhausted ones. See Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 913, 166 L.Ed.2d 798 (2007)("The PLRA does not require dismissal of the entire

complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. * * * If a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad.") It appears to be the majority view as well that exhausting administrative remedies after a Complaint is filed will not save a case from dismissal. See Neal v. Goord, 267 F.3d 116, 121-22 (2d Cir. 2001)(*overruled on other grounds*), a Section 1983 action, citing numerous cases. The rationale is pragmatic. As the Court stated in Neal, allowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court. Moreover, if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court would have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset. Neal, 267 F.3d at 123. In Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999), the Court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court.. . .The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." Thus, the PLRA requires that available administrative remedies must be exhausted before the filing of a suit in Federal Court. It is further clear that the PLRA does not require that an inmate allege or demonstrate that he has exhausted his administrative remedies. See Jones v. Bock, supra; Anderson v. XYZ Correctional Health Services, 407 F.3d 674, 677 (4th Cir. 2005). Failure to exhaust administrative remedies is an affirmative defense. Prison officials have the burden of proving that the inmate had available remedies which he did not exhaust. See Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004)("Although exhaustion of administrative remedies is a precondition to a federal prisoner

33

filing a <u>Bivens</u> suit, [citations omitted] failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." (Citations omitted)) The Court is not precluded, however, from considering at the outset whether an inmate has exhausted administrative remedies. The Fourth Circuit stated in <u>Anderson</u>, 470 F.3d at 683, as follows:

> [A]n inmate's failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant. That exhaustion is an affirmative defense, however, does not preclude the district court from dismissing a complaint where the failure to exhaust is apparent from the face of the complaint, nor does it preclude the district court from inquiring on its own motion into whether the inmate exhausted all administrative remedies.

The West Virginia Division of Corrections' Policy Directive 335.00 establishes procedures whereby state inmates may seek review of complaints which relate to any aspect of their imprisonment. Within 15 days after the circumstances occurred which are the subject of the inmate's complaints, the inmate must submit a G-1 Grievance Form to the Unit Manager. The Unit Manager must respond to the inmate's Grievance within five business days. If the Unit Manager's response is unfavorable, the inmate may appeal within five working days to the Warden/Administrator by filing a G-2 Grievance Form. The Warden/Administrator must respond to the appeal, in writing, within five working days. If the Warden/Administrator, in his/her discretion, determines that an investigation is warranted, a final response shall be made to the inmate within 30 working days. If the Warden/Administrator's response is unfavorable, the inmate may appeal within five working days to the Commissioner/designee of the Division of Corrections. The Commissioner must respond to the appeal within ten working days. The administrative process is exhausted when the Commissioner responds to the inmate's final appeal. The entire process takes about 60 days to complete.

  In their Motions, Defendants argue that Plaintiffs failed to exhaust their administrative

remedies concerning their request for the following: (1) To permanently house each Plaintiff in a single occupancy cell for the remainder of his sentence; (2) To provide each Plaintiff with a laptop or other computer equipped with the Hare Krishna Bhaktivedenta Folio Programs, along with Microsoft Word, memory cards, and a printer; (3) To provide Plaintiffs with a reasonable opportunity to shower at 4:00 a.m. and at other times as required by their religious practice; (4) To allow each Plaintiff to obtain, possess and maintain deity figures, deity cabinet, deity clothes and jewelry, as well as prayer beads, bead pouches, threads, and neck beads; and (5) To permit Plaintiffs to freely correspond with prisoners in other correctional facilities. (Document No. 70-1, pp. 18 - 21.) Defendants state that "[t]hese requests have not been the subject of grievances by the Plaintiffs." (Id., p. 18.) Plaintiffs did not address the foregoing argument in their Response. (Document No. 91-1.)

Based upon a review of the record, the undersigned finds that Plaintiffs failed to exhaust their administrative remedies concerning the foregoing claims. Although Plaintiffs contend that they fully exhausted their administrative remedies concerning all of the foregoing claims, the record does not support such a finding by the Court. In their Complaint, Plaintiffs state that they "have fully exhausted each of their administrative remedies . . . (See Plaintiff's attached exhibits)." (Document No. 25, p. 15.) Plaintiffs proceed to set forth a summary of their grievances. (Id., pp. 15 - 21.) Plaintiffs' summary, however, does not include a grievance concerning the foregoing claims. (Id.) Additionally, the undersigned has thoroughly reviewed all documents submitted by Plaintiffs and finds no indication Plaintiffs fully exhausted the foregoing claims. The undersigned, therefore, finds that Plaintiffs failed to fully exhaust their foregoing claims. Based on the foregoing, the undersigned respectfully recommends that

Defendants be granted summary judgment as to Plaintiffs' claims regarding the following: (1) Permanent single cell housing for each Plaintiff; (2) A laptop equipped with the Hare Krishna Bhaktivedenta Folio Programs, along with Microsoft Word, memory cards, and a printer for each Plaintiff; (3) An opportunity for each Plaintiff to shower at 4:00 a.m. and at other times as required by their religious practice; (4) Plaintiffs be allowed to obtain and possess deity figures, deity cabinet, deity clothes and jewelry, as well as prayer beads, bead pouches, threads, and neck beads; and (5) Plaintiffs be allowed to freely correspond with prisoners in other correctional facilities.

**7.       RLUIPA Claim:**

Title 42 U.S.C. § 2000cc-1 provides as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-2(b) provides:

> If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

Thus, a plaintiff bears the initial burden of proving that defendant's actions (1) substantially burdens (2) plaintiff's sincere religious exercise. Holt v. Hobbs, ___ U.S. ___, 135 S.Ct. 853, 862, 190 L.Ed.2d 747 (2015); also see Godbey, 2014 WL 794274 at 8. A substantial burden requires "substantial pressure on an adherent to modify his behavior and to violate his beliefs."

Liberty University, Inc. v. Lew, 733 F.3d. 72, 99-100 (4th Cir. 2013)(citing Thomas v. Review Bd. Of Ind. Employment Sec. Div., 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)). If a plaintiff satisfies his initial burden, the burden shifts to the government to prove the substantial burden is in furtherance of a compelling government interest and is the least restrictive means of furthering that compelling governmental interest. Id. RULIPA "provides more stringent protection of prisoners' free exercise rights than does the First Amendment, applying 'strict scrutiny instead of reasonableness.'" Jehovah v. Clarke, 2015 WL 4734716, * 4 (4th Cir. August 11, 2015)(citing Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006)); also see Kyles v. Atkinson, 2014 WL 4249878 (D.S.C. Aug. 26, 2014)(RFRA and RULIPA cases are relied upon interchangeably because of their substantial similarity).

### A.    Prasadam Diet:

In their Complaint, Plaintiffs claim that Defendants refuse "to provide Plaintiffs a diet free from contamination of prohibited substances such as meat, fish, eggs and their byproducts and derivatives thereof." (Document No. 25, p. 27.) Plaintiffs, therefore, contend that they are being denied a "palatable, nutritionally balanced diet consistent with their sincerely held religious beliefs." (Id.) Next, Plaintiffs claim that their diet is contaminated insofar as they are served food items containing animal products and/or byproducts on trays and with utensils which are contaminated by their contact with trays and utensils which have been exposed to such products and/or byproducts. (Id., p. 26.) Finally, Plaintiffs allege that Defendants refuse to allow the preparation of Plaintiffs' food by a devotee of the Hare Krishna religion. (Id.) Plaintiffs explain that "all foods eaten by a Hare Krishna devotee are to be prepared by a devotee of the Hare Krishna religion (ISKCON)." (Id.) Plaintiffs contend that "during all phases of cooking and

preparation, the devotee of Krsna must maintain an attitude and mood of love and devotion to Lord Krsna." (Id.)

In their Motions, Defendants argue that MOCC "has not refused to provide Plaintiffs with a prasadam diet." (Document No. 70, pp. 28 - 29.) Specifically, Defendants claim that "Hare Krishna devotees are provided with a vegetarian, non-flesh diet which excludes the presence of meat, fish, eggs and their byproducts, in keeping with their religious beliefs and as overseen by a dietician." (Id.) Defendants argue that "[o]fficials need not provide a special religious diet if the inmate can maintain an adequate diet by choosing items from the available menu that do not offend this sincere beliefs." (Id.) Next, Defendants argue that "non-flesh religious special diet food at Mount Olive Correctional Complex is prepared and served on 'uncontaminated' equipment and dinnerware." (Document No. 7-1, p. 3.) Additionally, Defendants state that "religious special diets are prepared in a special area using utensils, trays, pots, appliances, etc., used only in the preparation of those meals." (Id.) Finally, Defendants argue that the alleged requirement that meals be prepared by a Hare Krishna devotee is not absolute "since Plaintiffs' own evidence of the Book of Bhakti indicates that such meals prepared by non-devotees should be avoided, but are not absolutely forbidden." (Id., p. 6.) Defendants also note that it would be a "significant financial, administrative, and security effects on the prison if it were required to provide Plaintiffs specially prepared Hare Krishna meals." (Id.)

In Response, Plaintiffs argue that they are entitled to relief based upon the denial of a prasadam diet. (Document No. 91-1, pp. 23 - 64.) First, Plaintiffs continue to argue that Defendants allow for the occurrence of daily cross-contamination. (Id.) Next, Plaintiffs argue

that there is no substitute for the preparation of their food by a Hare Krishna devotee. (Id.) Plaintiffs contend that Defendants should either allow them to prepare their own meals or allow them to have meals shipped from a Hare Krishna source. (Id.)

In Reply, Defendants dispute Plaintiffs' argument concerning the occurrence of daily cross-contamination. (Document No. 97, pp. 12 - 21.) Next, Defendants continue to argue that "Plaintiffs being unable to cook their own meals is not a substantial burden." (Id., p. 22 - 23.) Defendants further argue that "[n]either the secure, cost effective and orderly operation of the dining room, nor the custody requirements of a maximum security prison, will permit Mount Olive correctional Complex to afford any faith group the right to prepare meals exclusively for members of their own faith group." (Id., pp. 23 - 26.)

Plaintiffs contend that they are being denied a prasadam diet because prohibited food items are served to Plaintiffs, cross-contamination is occurring, and Plaintiffs are not allowed to prepare their own meals. In the instant case, Defendants do not dispute that a prasadam diet is part of Plaintiffs' sincerely held religious beliefs as a Hare Krishna. Accordingly, the undersigned finds a prasadam diet constitutes a sincere religious exercise for Plaintiffs.

### (i)   Prohibited Food Items.

The undersigned finds that Plaintiffs have not produced any evidence demonstrating that Defendants' conduct and policies have substantially burdened their religious activities by serving them with prohibited food items. Plaintiffs claim that their diet is contaminated insofar as they are served food items containing animal products and/or byproducts. Specifically, Plaintiffs explain that a central tenant of their religion prohibits eating "meat, fish, eggs, onions, garlic, or any of their byproducts or derivatives." (Document No. 91-1, pp. 57 - 58.) Plaintiffs contend that

Defendants are serving them pasta, macaroni and like products containing eggs. (Id., p. 60.) In support, Plaintiffs explain that the "Government Printing Office documentation on FDA standards governing pasta, macaroni and like products . . . states that unless otherwise indicated, such products do contain egg products unless they are prepared with 100% vegetable ingredients (vegetable noodles or pasta) or are from 100% whole wheat (100% whole wheat noodles)." (Id. and Document No. 91-10, pp. 21 - 39.) In his Affidavit, Mr. Rider refutes Plaintiffs' claims stating that Plaintiffs are served a non-flesh religious diet free from animal products and byproducts. Specifically, Mr. Rider states that "Hare Krishna devotees are provided with a vegetarian, non-flesh diet which excludes the presence of meat, fish, eggs and their byproducts, as is overseen by a dietician."(Document 69-4.) In Warden Ballard's Affidavit, he states that "[n]o egg noodles or other commodities that consist of ingredients prohibited to the Hare Krishna devotees are served on the non-flesh diet." (Document No. 97-1, p. 6.) The undersigned finds that Plaintiffs have failed to produce any evidence supporting their claim that they are served prohibited foods items. Plaintiffs' citation of the FDA standards on pasta and macaroni does not support Plaintiffs' conclusion that they are being served noodles containing eggs. The Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002)(citing, Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)). Also, the Court is not required to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." Id. The undersigned, therefore, finds that there is no indication that Plaintiffs' religion is being substantially burden by Defendants serving Plaintiffs prohibited food items. Accordingly, the undersigned respectfully recommends that Defendants' Motions be granted as

to the above claim.

### (ii)     Cross-Contamination.

The undersigned finds that Plaintiffs have not produced any evidence demonstrating that Defendants' conduct and policies have substantially burdened their religious activities based upon cross-contamination. Plaintiffs claim that their diet is contaminated insofar as they are served food items containing animal products and/or byproducts on trays and with utensils which are contaminated by their contact with trays and utensils which have been exposed to such products and/or byproducts. Mr. Rider refutes Plaintiffs' claims in his Affidavit stating that Plaintiffs are served a non-flesh religious diet free from animal product and byproduct contamination upon yellow trays and with utensils kept separate from contaminated trays and utensils.[12] Specifically, Mr. Rider states as follows:

> 8.      The religious special diets are prepared in a special area using utensils, trays, pots, appliances, etc., used only in the preparation of those meals. The handles of pots, pans, and utensils used to prepare and serve the Hare Krishna devotees' food have been dipped in yellow coating to distinguish them so that they will not come in contact with mainline population food. Yellow trays are provided for the Hare Krishna devotees' use for this same purpose. The refrigerator, sinks, and preparation tables used for the preparation and storage of the non-flesh religious special diet are maintained in a cage-like area that is locked when not in use. A separate stove/oven is also used for the preparation of this vegetarian food. It is established procedure that all of the yellow pots, pans, trays and other

---

[12] The undersigned finds Plaintiffs' Affidavits self-serving and conclusory and therefore not probative. *See Evans v. Technologies & Applications Service Co.*, 80 F.3d 954, 962 (4th Cir. 1996)("[w]e generally consider self-serving opinions without objective corroboration not significantly probative . . ..") Mr. Rider's Affidavit on the other hand includes copies of pictures and documents which corroborate his statements and therefore has probative value. Warden Ballard's statements contained in his Affidavit (Document No. 97, Exhibit 1.) likewise are corroborated by the documents attached to Defendants' Reply to Plaintiffs' Response to their Motion to Dismiss (Document No. 97.) and are probative. The Affidavits of Mr. Rider and Warden Ballard substantially refute Plaintiffs' claims as contained in their pleadings and Affidavits that they are substantially burdened in the exercise of their religious beliefs.

utensils are washed separately from those of the mainline population.

(Document No. 69-4.) Mr. Rider attaches pictures depicting the place at MOCC where the trays

and utensils are kept. (Document No. 69-5.)

In Response, Plaintiffs complain that "their eat ware is cross contaminated on a daily

basis." (Document No. 91-1, pp. 11, 51, 65.) Specifically, Plaintiffs allege that "the entire

compliment of eat ware and other eating utensils, cooking pots and pans, tilt skillets, stove, etc.,

provided by Defendants for Hare Krishna practitioners are repeatedly cross-contaminated on a

regular, daily basis." (Id., p. 51.) In support, Plaintiffs attach Affidavits from fourteen inmates

stating that they have witnessed cross-contamination. (Plaintiffs Exhibits, 22-a - 22-o.)

Specifically, Inmates Adams and Vanover state that they washed pots and pans designated for

the Hare Krishna/Non-Flesh diet in a common pots and pans washing area used for mainline

washing. (Document No. 91-9, pp. 5 and 8.) Inmates Adams, Gill, and Price further state that all

eat ware and utensils are returned through a common slot and they have witnessed the

intermingling of the eat ware and utensils. (Id., pp. 5, 14, 15.) Inmates Schwab and Roy state that

they observed tilt skillets designed for use for Hare Krishna/Non-Flesh diet being used for

mainline meats and eggs.[13] (Id., pp. 9 and 11.) Inmate Schwab states that he observed prison staff

using eating bowls and utensils designated for the Hare Krishna/Non-Flesh diet. (Id., p. 10.)

Inmate Roy states that he observed a yellow cart designed for use for Hare Krishna/Non-Flesh

diet being used for transporting and storing meat. (Id., p. 11.) Inmate Roy further states that he

observed a pots and pans designed for use for Hare Krishna/Non-Flesh diet being used for

_____

[13] Although Defendants do not dispute that Inmates Schwab and Roy observed tilt skillets being
used for mainline meats and eggs, Warden Ballard states in his Affidavit that "[t]here are no tilt
skillets designated for Hare Krishna used." (Document No. 97-1, p. 4.)

cooking food items containing meat, fish, and eggs. (Id., pp. 11.) Inmates Gill and Price state that they have observed eggs and foods items containing eggs being placed on yellow trays designed for use for Hare Krishna/Non-Flesh diet. (Id., pp. 14 - 15.)

Concerning the foregoing, the undersigned first notes that MOCC Post Order 4C-05 provides that "[w]hen trays are returned to the dish-tank area, the trays and utensils shall be stacked separately by color. The trays and utensils will be washed (separately by color) in the dishwasher after mainline feeding is competed and all trays and utensils utilized for mainline meals have been washed." After the filing of the Inmate Affidavits, Defendants meet with Mr. Drescher concerning the request to separate food trays from the rest of the food trays when they are returned for washing. (Document No. 97-8.) In his Affidavit, Associate Warden Tim Wittington stated that MOCC staff immediately put a cart in the dining room for the return of trays for Hare Krishna/Non-Flesh diet. (Id.) With regards to the washing of the trays, Plaintiffs have failed to show how Defendants' above procedure of separately washing trays in a dishwasher located in a common area resulted in a violation of their religious beliefs. Additionally, Defendant Ballard explained in his Affidavit that "if Aramark and/or MOCC found that a violation of the special diet policy had occurred, new pots, utensils or other items were purchased to prevent cross-contamination." (Document No. 97-1, p. 5.) Although the Inmate Affidavits indicate that cross-contamination had occurred in the past, Plaintiffs produce no evidence indicating that cookware, trays, and utensils were not replaced upon notification of cross-contamination.[14] Furthermore, there is no indication that Plaintiffs were forced to eat from

---

[14]   Affidavits from several of the inmates described alleged cross contamination that occurred prior to Plaintiffs declaring themselves to be Hare Krishna devotees. (Document No. 91-1, pp. 12 - 13, 16, 23.) Two inmates filed Affidavits stating that they observed Correctional Officer Cindy Coleman place meat on a yellow tray on October 14, 2008. (Document No. 91-9, pp. 6 - 7.)

43

cookware, trays, or utensils that were known to be cross-contaminated. See Lovelace, 472 F.3d at 194(RULIPA is not intended to remedy negligent violations of inmates' religious practices.)

Plaintiffs argue that "there is no factual basis for Defendants' claim that proper procedures to prevent cross-contamination are being followed . . . because Defendants have not promulgated or enacted a specific formal written policy and procedure to ensure the proper segregation and integrity of all cooking appliances and equipment, eat ware and utensils, to include their collection after use, washing, etc." (Document No. 91-, p. 51) The record, however, clearly reveals that MOCC has implemented the following policies and protocols to ensure against cross contamination: (1) Operational Procedure 4.20 setting forth the "Special Diet Color Code System" (Document No. 97-6.); and (2) "Post Order 4C-05" setting forth "Religious Special Diet Preparation and Serving Procedures" (Document No. 97-7.) Additionally, Aramark has specific procedures set forth in their "Aramark Correctional Services Medical Nutrition Therapy & Religious Meals Manual." (Document No. 97-1, pp. 18 - 26.) Defendants further indicate that in January, 2009, Defendants accommodated Mr. Drescher's request that a separate cart be placed in the dining room for the return of Hare Krishna food trays to prevent any possible cross-contamination. (Document No. 97-8.) Thus, the record does not support Plaintiffs claim that Defendants are placing a substantial burden upon their religion by requiring them to eat from cookware, trays, or utensils known to be cross-contaminated. See Muhammad v. Sapp, 388 F.Appx. 892, 897 (11th Cir. 2010)(finding no RLUIPA violation where prison rejected a Muslim inmate's request for an alcohol-free lacto-vegetarian diet prepared with and served on

---

Defendants, however, produce documentation exhibiting that Officer Coleman was assigned to Slayton Work Camp and was out with an inmate work crew on October 14, 2008. (Document No. 97-4.)

non-disposable utensils that had never come into contact with meat or alcohol products or byproducts and that were not prepared near meals containing meat or alcohol because of the contamination risk); Holsombach v. Norris, 2009 WL 424166, * 6 (E.D.Ark. Feb. 18, 2009)(finding that defendants employed reasonable measures to maintain a division between the mainline food preparation and Kosher food preparation; defendants are not held to an absolute standard and are not liable for random incidents of misconduct by inmates).

### (iii) *Preparation of Meals.*

In their Motions, Defendants argue that the alleged requirement that meals be prepared by a Hare Krishna devotee is not absolute "since Plaintiffs' own evidence of the Book of Bhakti indicates that such meals prepared by non-devotees should be avoided, but are not absolutely forbidden." (Document No. 70-1, p. 6.) Thus, Defendants contend that "the lack of a devotee to prepare Plaintiffs' food does not substantially burden their religious exercise." (Id.) Defendants also note that it would be a "significant financial, administrative, and security effects on the prison if it were required to provide Plaintiffs specially prepared Hare Krishna meals." (Id.) Defendants explain that "[n]either the secure, cost effective and orderly operation of the dining room, nor the custody requirements of a maximum security prison, will permit Mount Olive to afford any faith group the right to prepare meals exclusively for members of their own faith group." (Id.) Defendants, however, acknowledge that "Hare Krishna inmates may apply to work in the kitchen in the same manner as non-Hare Krishna inmates." (Id.) As an Exhibit, Defendants attach pertinent pages from "The Definitive Guide to Practicing Krsna Consciousness in Prison" published by The Prison Ministry of the International Society for Krishna Consciousness and written by Thomas Drescher. (Document No. 69-8).

In Response, Plaintiffs continue to argue that they must prepare their own food. (Document No. 91-1, p. 9.) Plaintiffs argue that "their spiritual food is their sacrament for deliverance to Lord Krsna [and] [i]t is a critically important component of their practice." (Id.) Plaintiffs allege that where they "are forced to forego this all important component of their religious practice, it forces them to modify their spiritual practice in significant ways that violate their religious beliefs and places their immortal souls in dire peril." (Id.) Plaintiffs argue that Defendants take "Drescher's instructive words out of their intended context" and "Drescher's statement and the intent of his instruction is given for a worst case scenario situation." (Id., p. 14.) Plaintiffs acknowledge that "[i]f this is the best that a person can do in his limited situation, then it may temporarily suffice." (Id.) Plaintiffs, however, argue that "it is in no way meant to serve as a permanent substitution for the actual accepted standard of preparing and offering Hare Krishna prasadam." (Id.) Plaintiffs argue that "[f]oods can only be considered Hare Krishna prasadam when said foods are prepared, cooked, and offered to Lord Krsna by an authorized Vaisnava devotee of Lord Krsna in a mood of love and devotion on sanctified, uncontaminated equipment." (Id., p. 26.) Plaintiffs state that they "could prepare and cook their own meals at minimal or no extra expense, i.e., simply enlisting or substituting authorized Hare Krishna practitioners to prepare and cook their own meals instead of non-Hare Krishna practitioner, or alternatively, have Hare Krishna prasadam meals provided by the New Vrindaban Hare Krishna community of Marshall County, West Virginia at minimal cost." (Id., pp. 43 - 44.)

Plaintiffs submit an unsigned "All Purpose Declaration" from the ISKCON Prison Ministries stating that it is a religious requirement of the Hare Krishna faith that "[a]ll foods must be prepared by an authorized member of the Hare Krishna religion in a mood of love and

devotion." (Document No. 91-5, p. 6.) In his Affidavit, Chandramauli Swami states that "all foods must be prepared by an authorized member of the Hare Krishna religion . . . in a mood of love and devotion." (Document Nos. 91-4, p. 15) Chandramauli Swami explains that "by offering such prepared foods with love and devotion to Lord Krsna, the food then becomes spiritualized, and is eaten as prasadam." (Id.) Plaintiffs also submit an article entitled "When Does Food Become Prasadam?" written by Sivarama Swami. (Document No. 91-5, pp. 11 - 15.) This article states that un-offered food (bhoga) becomes prasadam when it is offered to Lord Krsna. (Id., p. 11.) Additional Exhibits provided by Plaintiffs only indicate that Hare Krishna devotees should avoid eating food that is not offered to Lord Krsna. In an article entitled "Offenses to Avoided," it is stated that "[o]ne should not eat anything which is not offered first to Krsna." (Document No. 91-7, p. 9.) In an article entitled Bhagavad-gita As It Is," it is stated that "[t]hose who do not make an offering of their food, . . . are eating only sin. . . . Above all, the offering should be made with an attitude of love." (Document No. 91-7, p. 16.) In an article entitled "Dhyana-Yoga," it is stated that "[a] person in Krsna consciousness does not eat anything which is not first offered to Krsna." (Id., p. 18.)

The undersigned finds that Plaintiffs have failed to establish that Defendants' restriction concerning the preparation of meals by Hare Krishna devotees constitutes a substantial burden. As stated above, a substantial burden requires "substantial pressure on an adherent to modify his behavior and to violate his beliefs." Liberty University, Inc., 733 F.3d. at 99-100 (citing, Thomas v. Review Bd. Of Ind. Employment Sec. Div., 450 U.S. at 718, 101 S.Ct. at 1425). "A substantial burden must be more than an inconvenience or a less desirable situation." Ra v. Braxton, 2005 WL 1533124 (W.D.Va. June 29, 2005)(citing, Woods v. Evatt, 876 F.Supp. 756, 762 (D.S.C.

1995)); also see Konikov v. Orange County, 410 F.3d 1317, 1323 (11th Cir. 2005)(A burden that is merely an "inconvenience on religious exercise" is not substantial); Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003)(recognizing that RLUIPA was not meant to create a cause of action for every decision that constrains religious exercise, or the word "substantial" would be meaningless). Although Plaintiffs submit an Affidavit and Declaration indicating that all food must be prepared by an authorized member of the Hare Krishna religion, the remaining Exhibits indicate only that a Hare Krishna must first offer his food to Lord Krsna with an attitude of love. See Erwin v. United States, 591 F.3d 313, 325 n. 7 (4th Cir. 2010)("A genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's [evidence] is correct"); Alba v. Merrill Lynch & Co., 198 Fed.Appx. 288, 300 (4th Cir. 2006)(stating that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). Additionally, Plaintiffs fail to explain why the preparation of food by a non-devotee would compromise their religious beliefs. Specifically, Plaintiffs fail to explain how the foregoing restriction impacted their food offering and violated their beliefs. Furthermore, "The Definitive Guide to Practicing Krsna Consciousness in Prison," published by The Prison Ministry of the International Society for Krishna Consciousness and written by Thomas Drescher, instructs Hare Krishna inmates to "[s]tick to this simple but powerful routine each time you cook or eat from the prison dining room:"

> Once cooking is complete, place the food before or adjacent to the altar picture of Srila Prabhupada, bow your head, and with folded hands pray to Srila Prabhupada, "Dear Srila Prabhupada. Please accept this offering for Krsna on my behalf. I regret it is the best your humble servant can offer at this time. Thank you." Chant this prayer three times and repeat the entire Maha-mantra three times.

(Document No. 69-8, pp. 8 - 9). Although Plaintiffs contend that Drescher's above instruction is "given for a worst case scenario," Plaintiffs acknowledge that "[i]f this is the best that a person can do in his limited situation, then it may temporarily suffice." (Document No. 91-1, p. 14.) Thus, Plaintiffs have not established that the preparation of food by non-devotee required Plaintiffs to modify their behavior and violate their religious beliefs. Plaintiffs have only established that their desire for Hare Krishna food to be prepared by a devotee is a preferred method of religious practice and results only in an inconvenience to their religious practice. See Krieger v. Brown, 496 Fed.Appx. 322, 325-26 (4th Cir. 2012)(Affirming the grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the request for sacred items modified his behavior and violated his religious beliefs." Plaintiff "asserted that the deprivation of the outdoor worship circle would require him to pray indoors, and that the 'Blot' ceremony is 'best performed outdoors.'"). The undersigned, therefore, finds that Plaintiffs have failed to establish that the preparation of food by non-devotees places a substantial burden on their ability to exercise their religion.

Notwithstanding the foregoing, the undersigned finds that even if Plaintiffs could demonstrate a substantial burden, Defendants have established that the burden is the least restrictive means of furthering a compelling governmental interest. It is well established that courts should "not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety" and will instead apply RULIPA "in an appropriately balanced way." Cutter v. Wilkinson, 544 U.S. 709, 711, 722, 125 S.Ct. 2113, 161 L.Ed2d 1020 (2005). Courts must give due deference to compelling state interest such as "good order, security and discipline, consistent with consideration of costs and limited resources." Id., 544 U.S. at 723, 125 S.Ct. 2123. Conclusory assertions of a "legitimate interest" without further

explanation is deemed "superficial" and insufficient." Lovelace, 472 F.3d at 190; see Smith, 578 F.3d at 272 (stating the justification for a policy was "'for security reasons' . . . does not, by itself, explain why the security interest is compelling"). Defendants must "connect the . . . restriction [at issue] to specific . . . security concerns and show [] that those concerns are furthered by the" restriction." Couch v. Jabe, 679 F.3d 197 (4th Cir. 2012). To demonstrate that the restriction at issue is the least restrictive means of furthering a compelling government interest, defendants must demonstrate that they have "acknowledged and given some consideration to less restrictive alternatives." Id. Defendants contend that "neither the secure, cost effective and orderly operation of the dining room, nor the custody requirements of a maximum security prison, will permit Mount Olive to afford any faith group the right to prepare meals exclusively for members of their own faith group." (Document No. 70-1, p. 6.) Defendants first explain that they considered and investigated obtaining Hare Krishna prasadam meals from the New Vrindaban Hare Krishna community located in Marshall County, West Virginia. In Warden Ballard's Affidavit, he explains that the Food Service Director contacted the ISKCON and the Hare Krishna temple at Moundsville, West Virginia, to determine the cost to have Hare Krishna meals shipped from a vendor but there has been no response. (Document No. 97-1, p. 6.) Defendants explain that it costs $1.50 to $1.55 for each non-flesh meal provided at MOCC. (Id.) Defendants further note that there would be a security risk of contraband being added to the meals during the process of preparation, transportation, and delivery of the meals. See Skenandore v. Endicott, 2006 WL 2587545 (E.D.Wis. Sept 6, 2006)(finding that defendants met their burden of justification by showing a compelling state interest in preventing the use of foods prepared outside the institution based upon concerns of condition of the food and the

introduction of contraband.) Defendants further note that the Hare Krishna community at Moundsville is over 185 miles from MOCC. Concerning Plaintiffs' request to prepare their own meals, Defendants explain that there are expansive security and financial concerns. Specifically, Defendants explain that "[a]s a result of the structure of the physical plant layout of the kitchen and dining room areas at Mount Olive Correctional Complex, it would not be feasible to modify the kitchen to create a third "Hare Krishna only" kitchen with its own trays, utensils, devotee cook, separate from the other inmates who are now sharing the non-flesh diet." Prisons have a compelling and legitimate governmental interest in the orderly administration of a food service program that accommodates the religious dietary needs of hundreds of prisoners. Yisrael v. Beasley, 2012 WL 2919984 (E.D.N.C. July 17, 2012)(finding that "any burden defendants continue to place on plaintiff's religious beliefs – such as not requiring kitchen staff to ritually cleanse themselves for a 24 hour period or not serving plaintiff fruit bearing a kosher symbol – are justified by the state's compelling interest in avoiding excessive administrative burdens.") Based upon the foregoing, the undersigned finds that Defendants have established that the alleged burden is the least restrictive means of furthering a compelling governmental interest. The undersigned, therefore, respectfully recommends that Defendants be granted summary judgment as to the above claim.

**B.     Ekadasi Fast Days and Holy Days:**

In their Complaint, Plaintiffs claim that Defendants have substantially burdened their religious practices by refusing to allow Plaintiffs to participate in all Ekadasi fast and holy days. (Document No. 25, p. 27.) Plaintiffs explain that "Ekadasi fast occurs usually twice each month, based upon lunar calculations, and is a day where Hare Krishna devotees must refrain from

eating all foods containing grains or beans, including their byproducts or derivatives" or to be condemned for consuming "the accumulated sins of all mankind." (Id., p. 44.) Plaintiffs further list twenty-two holy days that they must strictly observe. (Id., pp. 44 - 45.)

In their Motions, Defendants argue that Defendants have not violated Plaintiffs' rights by refusing to allow Plaintiffs to participate in all Ekadasi fast and holy days. (Document No. 70-1, pp. 7 - 10.) Defendants explain that various groups, including the Hare Krishna faith, are provided a special meal or feast meal once a year. (Id., p. 9.) Defendants contend that this is not a substantial burden because Plaintiffs are not prohibited from celebrating any special days in an appropriate manner even though special foods are not provided. (Id., pp. 9 - 10.) Defendants further explain that Plaintiffs are never forced to eat items they do not wish to eat on a personal fast day and are permitted to supplement food items from "free flow" if they wish. (Id.) Defendants argue that the foregoing is "reasonably related to legitimate penological interests in being equitable in what it offers for various faith groups: one special feast meal once a year." (Id., p. 10.) Defendants contend that even if the foregoing is a substantial burden, the Defendants have "shown that their practice in dealing with the Ekadasi fast and holy days is in furtherance of a compelling governmental interest in being equitable in what it offers for various faith groups and is the least restrictive means of furthering that interest." (Id.)

In Response, Plaintiffs argue that they are entitled to relief based upon Defendants' refusal to accommodate Plaintiffs concerning Ekadasi fast days and holy days. (Document No. 91-1, pp. 29 - 30.) Plaintiffs again explain that they are proscribed from eating grains and beans on Ekasdasi fast days. (Id.) Plaintiffs complain that "since Plaintiffs are forbidden by their religious beliefs to eat the foods offered by Defendants, they are effectively left with nothing to

eat." (Id.) Plaintiffs argue that Defendants are required to provide "substitutions or alternative foods for Plaintiffs." (Id.) Finally, Plaintiffs complain that by refusing to accommodate Plaintiffs' dietary needs, Defendants are forcing Plaintiffs to either barter with other inmates or purchase food from the Co-Op Commissary inmate store at their own expense to supplement their diet on Ekadasi fast days." (Id., p. 42.)

The undersigned finds that Plaintiffs have failed to establish that the practice of their religion is substantially burdened by the one special meal policy. Defendants have produced adequate evidence that Hare Krishna devotees may fast and observe religious holidays according to their religious beliefs at any time during the year, and they are not prevented for pursuing individualized worship in the absence of the requested special meals. Specifically, Plaintiffs are not prevented from observing Ekadasi fast or holy days. Plaintiffs are merely prevented from observing Ekadasi fast and holy days in their preferred manner with alternative meals or food items. The undersigned notes that the record does not support Plaintiffs' conclusory claim that their religious beliefs prevent them from eating any foods offered by Defendants on Ekadasi fast days. Plaintiffs acknowledge that they are only prohibited from eating grains and beans on Ekadasi fast days, and they are not prohibited from eating potatoes, fruits, and milk. (Document No. 91-1, p. 30.) It is unreasonable to conclude that only grains and beans are served by Defendants on Ekadasi fast days. Additionally, Plaintiffs are allowed to supplement their meals with acceptable food items from the "free flow" line and the commissary. Therefore, Plaintiffs cannot show that their religious practices have been substantially burdened by the policy limiting religious meals to one per year. See Canedy v. Boardman, 91 F.3d 30, 33 (7th Cir. 1996)("A prisoner's right to freely exercise his religious beliefs does not depend upon his ability to pursue

each and every aspect of the practice of his religion."); <u>Winder v. Maynard</u>, 2 F.Supp.3d. 709 (D.Md. Feb. 24, 2014)(finding that plaintiff failed to "provide specific facts to show how the denial of pork products via the dietary staff versus through the commissary substantially impeded his ability to practice his religious beliefs"); <u>Jihad v. Fabian</u>, 2011 WL 1641885 (D.Minn. Feb. 17, 2011)(finding that the DOC's policy of limiting plaintiff to one special feast per year did not impose a substantial burden on the practice of his religion).

Notwithstanding the foregoing, the undersigned finds that even if Plaintiffs could demonstrate a substantial burden, Defendants have established that the burden is the least restrictive means of furthering a compelling governmental interest. As stated above, courts should "not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety" and will instead apply RULIPA "in an appropriately balanced way." <u>Cutter</u>, 544 U.S. at 711, 722, 125 S.Ct. at 2113. First, Defendants have a compelling interest in treating all religious groups equally. The one religious meal policy applies to all religious groups, which prevents the perception of favoritism and minimizes the potential for inmate conflict. Furthermore, allowing more than one religious meal a year would impose additional financial burdens and staffing burdens. See <u>Muhammad v. Wade</u>, 2011 WL 837125, * 6 (E.D.Va. March 2, 2011)(The prisons' "Policy not to allow an Eid-ul-Fitr feast for one religion when no feasts are allowed for other religions is reasonably related to legitimate penological interests. There is a 'valid, rational connection' between [the prison's] policy not to allow special religious feasts, and the penological interest of controlling costs within the institution.") Thus, it is reasonably foreseeable that if additional religious meals were provided to Plaintiffs, many other religious groups would request such an accommodation. Next, the

undersigned finds that the one religious meal policy is the least restrictive means of serving the above interest. Allowing Hare Krishna devotees more than one religious meal a year would result in a perception of favoritism and could result in inmate conflict. As stated above, allowing all religious groups an increased number of religious meals would cause substantial burdens financially and administratively. Based upon the foregoing, the undersigned finds that Defendants have established that the alleged burden is the least restrictive means of furthering a compelling governmental interest. See Skenandore v. Endicott, 2006 WL 2587545 (E.D.Wis. Sept. 6, 2006)(finding that the DOC's "one religious feast per year per religious umbrella group" was the least restrictive means of furthering a compelling governmental interest). The undersigned, therefore, respectfully recommends that Defendants be granted summary judgment as to the above claim.

C.      Co-Op Commissary and Hygiene Items:

In their Complaint, Plaintiffs claim that Defendants have substantially burdened their religious practices by refusing to provide Plaintiffs with requisite commissary food items and forcing Plaintiffs to pay a "diet co-payment" for their food. (Document No. 25, p. 35.) Plaintiffs complain that the commissary does not carry a sufficient quality of items acceptable for consumption by a Hare Krishna. (Id.) Plaintiffs also request "razors, deodorant, soap, shampoo, toothpaste, and toothbrushes in sufficient quantity that are free from all animal testing and ingredients." (Id., p. 49.)

In their Motion, Defendants argue that Defendants have not violated Plaintiffs' rights by refusing to provide Plaintiffs with requisite commissary food items and forcing Plaintiffs to accept a diet co-payment for their food. (Document No. 70-1, pp. 11 - 14.) Defendants state that

there is no substantial burden because the items sold in the commissary are optional products for Plaintiffs to purchase and it is their decision whether or not to purchase items. (Id.) Defendants further note that they "would discuss adding items on a trial basis to see if they sell at our next meeting." (Id., p. 11.) Concerning hygiene items, Defendants state that the shampoo and toothpaste are purchased from Bob Barker and are animal free. (Id., p. 12.) Defendants, however, acknowledged that their investigation reveals that the soap contains beef tallow and Superintendent George Hill is searching for an alternative soap that does not contain animal byproducts. As to the quantity of hygiene products, Defendants argue that have followed standard procedure and Plaintiffs have received the same quantity as other inmates. (Id., p. 12.) Defendants argue that they have a compelling government interest in being cost effective and equitable in what items are offered to all inmates regardless of religious beliefs. (Id., p. 13.) Defendants assert that the least restrictive alternative is for Plaintiffs to supplement the hygiene supplies by purchasing desired items from the exchange. (Id.) Defendants further note that they do not purchase any products for any inmate in order for them to practices their declared belief. (Id., p. 14.) Plaintiffs are further allowed to write ISKON for food and supplies consistent with their religious practice. (Id.)

In Response, Plaintiffs argue that they are entitled to relief based upon Defendants' refusal to accommodate Plaintiffs' request for requisite commissary food items and hygiene items. (Document No. 91-1, pp. 52 and 64.) Plaintiffs state "[t]o the extent that they are able, Plaintiffs are forced to personally pay for essential nutrition via supplementary food items or must forego purchase of said items due to exorbitant prices[15]." (Id., p. 52.) Plaintiffs continue to

---

[15]   *See Garraway v. Lappin*, 2012 WL 959422 (M.D.Penn. March 21, 2012)("The mere fact that scented oil was subject to a 'mark up' in the commissary did not place a substantial burden on

argue that "Defendants refusal to accommodate Plaintiffs' religious beliefs by providing Plaintiffs with hygiene items in sufficient quantity that are animal free, places a substantial burden on Plaintiffs' practice of the Hare Krishna religion." (Id., p. 64.)

The Court finds that Plaintiffs have failed to establish that the practice of their religion is substantially burdened by the Defendants' alleged refusal to accommodate Plaintiffs' request for requisite commissary food items and hygiene items. First, Plaintiffs appear to acknowledge that the commissary carries certain food items. Plaintiffs, however, complain they should not be required to buy such food items and that the pricing is too high. Defendants' failure, however, to buy supplemental food or commissary items acceptable for the Hare Krishna religion does not result in a substantial burden. Defendants are clearly not required to purchase religious items for inmates in order for them to practice their religion. Additionally, the record clearly reveals that Plaintiffs are not prohibited for purchasing such items. To the extent the commissary does not offer acceptable supplemental food items, Plaintiffs are permitted to write ISKON for food consistent with the Hare Krishna religion. At most, the foregoing is merely an inconvenience on Plaintiffs' religious exercise. Concerning hygiene items, Defendants acknowledge that they have investigated Plaintiffs' complaint and it was determined that the only product that contained animal byproducts was the soap. Defendants state that they are searching for an alternative soap that did not contain animal byproducts. The undersigned finds that providing Plaintiffs with the same amount of hygiene products as provided to other inmates does not result in a substantial burden. To the extent Plaintiffs are requesting additional hygiene products, Plaintiffs may purchase supplemental supplies from the exchange. Requiring Plaintiffs to purchase

---

Plaintiff's ability to practice his religion.")

supplemental hygiene products is at most a mere inconvenience on their religious exercise. As stated above, Plaintiffs are allowed to write ISKON for supplies consistent with their religious practice.

Notwithstanding the foregoing, the undersigned finds that even if Plaintiffs could demonstrate a substantial burden, Defendants have established that the burden is the least restrictive means of furthering a compelling governmental interest. First, Defendants have a compelling interest in being cost effective and equitable in what items are offered to all inmates regardless of religious beliefs. Accommodations for individual offenders' preferences are simply not feasible from an administrative and financial standpoint. Concerning commissary items, Defendants acknowledged that they "would discuss adding items on a trial basis to see if they sell at our next meeting." Concerning hygiene items, Defendants are following standard procedure and Plaintiffs receive the same quantity as other inmates. Plaintiffs do not dispute that they are allowed to write ISKON for supplemental food items and supplies consistent with the Hare Krishna. Thus, Defendants have established that the above alleged burden is the least restrictive means of furthering a compelling governmental interest. The undersigned, therefore, respectfully recommends that Defendants be granted summary judgment as to the above claim.

### D.      Scented Oil:

In their Complaint, Plaintiffs claim that Defendants have substantially burdened their religious practices by refusing to allow Plaintiffs to have Hare Krishna Deity Puja with scented oil for worship. (Document No. 25, p. 27.) Specifically, Plaintiffs state that they cannot properly perform Hare Krishna Deity worship because they cannot obtain or possess scented oils. (Id.)

In their Motions, Defendants argue that Defendants have not violated Plaintiffs' rights by

refusing to allow Plaintiffs to have Hare Krishna Deity Puja scented oil for worship. (Document No. 70-1, pp. 14 - 15.) Defendants first argue that they have not imposed a substantial burden because Plaintiffs are allowed to use unscented oils. (Id.) Defendants argue that "[e]ven if an argument could be made that Plaintiffs' exercise of religion is substantially burdened, Mount Olive Correctional Complex has a compelling government interest not to permit scented oils or incense." (Id.) Defendants explain that "[n]o matter how lightly the oils or incenses are scented, they could be used to mask illegal activities such as smoking marijuana." (Id.) Defendants argue that making unscented oils available for inmate purchase for worship activities is the least restrictive means of furthering the government's compelling interest. (Id.)

In Response, Plaintiffs argue that they are entitled to relief based upon Defendants' refusal to "accommodate Plaintiffs' religious practice by permitting Plaintiffs to obtain, possess and utilize small quantities of lightly scented Hare Krishna religious oil, an essential component used in Hare Krishna Deity worship." (Document No. 91-1, pp. 62 - 63.) Plaintiffs contend that "the MOCC Co-op commissary inmate store sells numerous other scented items such as deodorant, soaps, shampoos, Magic Shave, etc., several of which have a markedly stronger scent than the oils Plaintiffs request." (Id.) Plaintiffs argue that the "least restrictive way to accommodate Plaintiffs' need would be to allow Plaintiffs to obtain and possess small quantities of said scented oil." (Id.)

The undersigned finds that Plaintiffs have failed to establish that the practice of their religion is substantially burdened by Defendants' refusal to allow Plaintiffs to have scented oil for worship. Plaintiffs have failed to establish that they are prevented from engaging in worship in the absence of scent oil. Specifically, Plaintiffs are not prevented from engaging in worship by

using unscented oil. Plaintiffs are merely prevented from engaging in worship in their preferred manner by using scented oils. See Jackson v. McBride, 2007 WL 2815447 (S.D.W.Va. Sept. 24, 2007)("The undersigned finds that while Plaintiff's right to exercise his Islamic religion is burdened by Defendants' policy, it is not substantially burdened given the alternative of unscented oils available to him."); also see Banks v. Beard, 2013 WL 5465165, * 11 (M.D.Penn. Sept. 30, 2013)(finding no substantial burden where the evidence indicated that the use of scented oil or perfume was only a recommended religious practice); Curry v. California Department of Corrections, 2012 WL 968079, * 6 (N.D.Cal. March 21, 2012)(finding that "the denial of oil while perhaps presenting some impediment, does not constitute a 'significantly great restriction' upon the exercise of his religious beliefs, nor does it make the religious exercise 'effectively impracticable.'"). The undersigned, therefore, finds that Plaintiffs have failed to establish a substantial burden on their ability to exercise their religion.

Notwithstanding the foregoing, the undersigned finds that even if Plaintiffs could demonstrate a substantial burden, Defendants have established that the burden is the least restrictive means of furthering a compelling governmental interest. As stated above, it is well established that courts should "not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter, 544 U.S. at 711, 722. Courts must give due deference to compelling state interest such as "good order, security and discipline, consistent with consideration of costs and limited resources." Id., 544 U.S. at 723, 125 S.Ct. 2123. Defendants explain that they have a compelling government interest not to permit scented oils because "[n]o matter how lightly the oils or incenses are scented, they could be used to mask illegal activities such as smoking marijuana." The undersigned finds that the

prison has a compelling government interest in preventing the masking the odors of illegal activities, such as smoking marijuana. See AlAmiin v. Morton, 528 Fed.Appx. 838 (10th Cir. 2013)(finding that evidence, including that prayer oils hampered dogs' ability to detect drugs, required the conclusion that banning possession of scented prayer oils further a compelling governmental interest of enhancing prison security). Additionally, the Court finds that allowing only unscented oils is the least restrictive means in furthering the compelling governmental interest. See Jackson, 2007 WL 2815447 at 9("Despite having the option to purchase other scented items at the MOCC commissary, Defendants specifically prohibit the use of the scented oils as their odor may be used to mask the odor of drugs, thereby inhibiting drug detection.")(citing, Hammons v. Saffle, 348 F.3d 1250, 1254-55 (10th Cir. 2003)); also see Guess v. McGill, 2014 WL 5106735, * 11 (D.S.C. Oct. 10, 2014)(finding "the prohibition on possession of oils is also a least restrictive prohibition considering the numerous other opportunities Plaintiff is afforded to practice his Muslim faith"). Based upon the foregoing, the undersigned finds that Defendants have established that the alleged burden is the least restrictive means of furthering a compelling governmental interest. The undersigned, therefore, respectfully recommends that Defendants be granted summary judgment as to the above claim.

**E.      Sankirtana Rehabilitative Programs:**

In their Complaint, Plaintiffs claim that Defendants have substantially burdened their religious practices by refusing to allow Plaintiffs to participate in Sankirtana rehabilitative programs. (Document No. 25, p. 27.) Specifically, Plaintiffs explain that they must assist "in the spread of Krishna consciousness through the process of Sankirtana." (Id., p. 45.) Plaintiffs explain that Hare Krishna Sankirtana includes congregational chanting of Krishna's holy names,

61

mass Krishna prasadam good distribution, and Hare Krishna literature distribution. (Id.)

In their Motions, Defendants argue that Defendants have not violated Plaintiffs' rights by refusing to allow Plaintiffs to participate in Sankirtana rehabilitative programs. (Document No. 70-1, pp. 15 - 17.) Defendants contend that Plaintiffs' religious exercise has not been substantially burdened because Plaintiffs have the opportunity to chant in the Chapel on a weekly basis and Hare Krishna literature is readily available in the Chapel. (Id.) Concerning the opportunity for mass Hare Krishna prasadam food distribution, Defendants state that they have a compelling governmental interest in maintain a policy of prohibiting inmates from trading and selling. (Id.) Defendants state that the least restrictive alternative is to permit an approved national Hare Krishna ministry the opportunity to plan and present an event subject to security requirements. (Id.)

In Response, Plaintiffs argue that they are entitled to relief based upon Defendants' refusal to allow Plaintiffs to participate in Sankirtana. (Document No. 91-1, pp. 61 - 62.) Plaintiffs state that they "did not request that they be permitted to trade or sell goods with others, only that they be able to participate in Sankirtana." (Id.) Plaintiffs alleges that "Defendants refusal to accommodate Plaintiffs' Sankirtana programs to include a dedicated Hare Krishna book display within the MOCC Chapel and outside volunteers conducting Hare Krishna retreats and book distribution, places a substantial burden on Plaintiffs' practice of the Hare Krishna religion." (Id.)

The undersigned finds that Plaintiffs have failed to establish that the practice of their religion is substantially burdened by Defendants' alleged refusal to allow Plaintiffs' participate in Sankirtana. Plaintiffs have failed to establish that they are prevented from engaging in the

exercise of their religion because Defendants provide Plaintiffs with the opportunity to chant in the Chapel on a weekly basis and make Hare Krishna literate readily available in the Chapel. Plaintiffs do not dispute that they can refer people to the Chapel, or can share the information and give an interested individual literature. Concerning the mass Hare Krishna prasadam food distribution, Defendants acknowledge that they will permit an approved national Hare Krishna ministry the opportunity to conduct such an event, subject to security requirements. (Document No. 69-4.) Plaintiffs have presented no evidence indicating that Defendants have refused a national Hare Krishna ministry such an opportunity. Plaintiffs merely indicate that their preferred method of practice would be to allow a fellow Hare Krishna inmate conduct such an event. The undersigned, therefore, finds that Plaintiffs have failed to establish a substantial burden on their ability to exercise their religion.

Notwithstanding the foregoing, the undersigned finds that even if Plaintiffs could demonstrate a substantial burden, Defendants have established that the burden is the least restrictive means of furthering a compelling governmental interest. As stated above, it is well established that courts should "not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter, 544 U.S. at 711, 722. Courts must give due deference to compelling state interest such as "good order, security and discipline, consistent with consideration of costs and limited resources." Id., 544 U.S. at 723, 125 S.Ct. 2123. Defendants explain that they have a compelling government interest "not to permit trading among inmates or exaltation of one inmate above others." Defendants first explain that they have a compelling interest in prohibiting inmates from trading and selling because "giving another inmate something is often the result of strong-arming or paying off a debt."

Defendants next explain that preventing a Hare Krishna inmate from conducting the mass Hare Krishna prasadam food distribution of Sirkatana, avoids elevating one inmate to a position of religious leadership over others. Shabazz v. Arkansas Department of Corrections, 157 Fed.Appx. 944, 945-46 (8th Cir. 2005)(affirming District Court's holding that avoiding the elevation of one inmate to a position of religious leadership furthers prison security). Additionally, the Court finds that allowing an approved national Hare Krishna ministry the opportunity to conduct mass Hare Krishna prasadam food distribution, subject to security requirements, is the least restrictive means in furthering the compelling governmental interest. Based upon the foregoing, the undersigned finds that Defendants have established that the alleged burden is the least restrictive means of furthering a compelling governmental interest. The undersigned, therefore, respectfully recommends that Defendants be granted summary judgment as to the above claim.

### F.    Claim for Monetary Damages:

To the extent Plaintiffs are requesting monetary damages for the alleged violation of RLUIPA, Plaintiffs are not entitled to such damages. The Fourth Circuit has determined that RLUIPA does not authorize claims for monetary damages. Rendelman v. Rouse, 569 F.3d 182, 187-89 (4th Cir. 2009); also see Sossamon v. Texas, 563 U.S. 277, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011)(finding that States did not waive "their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver"); Patterson v. West Virginia Regional Jail and Correctional Facility Authority, 2012 WL 3308607, * 7, fn. 7 (S.D.W.Va. July 3, 2012)(noting that plaintiff's RLUIPA claim failed because he asked only for money damages, which are not available under the act). Based on the foregoing, the undersigned finds that Plaintiffs' RLUIPA claim for monetary damages should be

dismissed.

**8.    First Amendment Claim:**

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Social Services, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States. Of the rights retained by inmates upon incarceration is the right to practice their religion while in prison. See O'Lone, v. Estate of Shadbazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001)(stating that the First Amendment protections, "including its directive that no law shall prohibit the free exercise of religion, extends to the prison environment"). The Free Exercise Clause of the First Amendment prohibits "policies that impose a substantial burden on a prisoner's right to practice his religion." Wall v. Wade, 741 F.3d 494, 498 (4th Cir. 2014)(quotation omitted). An inmate's Free Exercise rights, however, must be balanced with the security and administrative needs of the prison in which they are incarcerated. O'Lone, 482 U.S. at 348-49, 107 S.Ct. at 2404-05. "A neutral law of general applicability . . . does not violate the Free Exercise Clause." Liberty University, Inc., 733 F.3d at 99. "[A] prison regulation that abridges inmates' constitutional rights is 'valid if it is reasonably

related to legitimate penological interest." <u>Lovelace</u>, 472 F.3d at 199. Thus, "the First Amendment affords less protection to inmates' free exercise rights" than RULIPA. <u>Id.</u>; <u>also see</u> <u>Jehovah v. Clarke</u>, 2015 WL 4734716 * 4 (4th Cir. August 11, 2015)( RFRA "provides more stringent protection of prisoners' free exercise rights than does the First Amendment, applying 'strict scrutiny instead of reasonableness.")(citing <u>Lovelace v. Lee</u>, 472 F.3d 174, 186 (4th Cir. 2006)); <u>also see</u> <u>Kyles v. Atkinson</u>, 2014 WL 4249878 (D.S.C. Aug. 26, 2014)(RFRA and RULIPA cases are relied upon interchangeably because of their substantial similarity). To determine the reasonableness of the law, the Court should consider the follow factors: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether the inmate has an alternative means of exercising the right in question; (3) what impact the requested accommodation would have on prison officials, staff, other inmates, and prison resources; and (4) whether easy and obvious alternatives exist that indicate that the regulation is an exaggerated response by prison officials. <u>See</u> <u>Turner</u>, 482 U.S. at 89-92, 107 S.Ct. at 2261-63.

For the reasons stated above, the undersigned finds that Plaintiffs have failed to establish that Defendants' alleged misconduct resulted in a substantial burden on their religious exercise. When a plaintiff fails to set forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, the plaintiff's claim fails under the Free Exercise Clause of the First Amendment as well. <u>See</u> <u>Shabazz v. Johnson</u>, 2015 WL 4068590 (E.D.Va. July 2, 2015). Furthermore, there is no evidence that Defendants intended to interfere with Plaintiffs' religious exercise. To the extent Defendants may have substantially burden Plaintiffs' religious exercise, Defendants established a compelling government interest and a least restrictive means for their

action. Thus, Defendants have established that Defendants' actions were reasonably related to a "legitimate penological interest." <u>See</u> <u>Warsoldier v. Woodford</u>, 418 F.3d 989, 997 (9th Cir. 2005)(nothing that the "legitimate penological interest" is a lower standard than RLUIPA's "compelling government interest standard"); <u>Pugh v. Goord</u>, 571 F.Supp.2d 477, 503-04 (S.D.N.Y. July 31, 2008)("[T]he burden on defendants pursuant to RLUIPA, which requires that the challenged action must be the 'least restrictive means of furthering' a 'compelling government interest,' is a much higher burden than that articulated in *Turner*, which required only that a burden be 'reasonably related to legitimate penological interest.'"); <u>Cotton v. Cate</u>, 2011 WL 3877074, * 5 (N.D. Cal. Sept. 1, 2011)("RLUIPA has a less deferential standard than *Turner*, requiring the government to show that the burden it imposes on religious exercise is in furtherance of a 'compelling' government interest rather than simply a 'legitimate' penological interest, and that it achieves the compelling interest by the least restrictive means.") Therefore, the undersigned respectfully recommends that Defendants be granted summary judgment as to Plaintiffs' First Amendment claim.

**9.** **Equal Protection:**

In their Complaint, Plaintiffs allege that Defendants have violated their rights pursuant to the Equal Protection Clause of the Fourteenth Amendment. (Document No. 25, pp. 34 - 37.) First, Plaintiffs complain that Defendants allow Christians to have prominent displays of books and literature openly displayed throughout MOCC while Hare Krishna books and literature are restricted to a closed steel filing cabinet. (<u>Id.</u>, p. 37.) Next, Plaintiffs state that Christian and Muslim practitioners at MOCC are provided accommodation with regard to sacred fast days and holy days while Plaintiffs are denied accommodation for sacred fast days and holy days. (<u>Id.</u>, p.

67

48.) Finally, Plaintiffs assert that Defendants have denied Plaintiffs accommodation to engage in Sankirtana while allowing Christian Kairos, when both are aimed at rehabilitation through group prayer and eating. (<u>Id.</u>, p. 37.)

In their Motions, Defendants argue that they have not engaged in a violation of Plaintiffs' constitutional rights under the Fourteenth Amendment. (Document No. 70-1, pp. 21 - 23.) Defendants argue that "Plaintiffs cannot succeed on their equal protection claim because they cannot demonstrate that they have been treated differently from others with whom they are similarly situated." (<u>Id.</u>, p. 23.) First, Defendants contend that Hare Krishna literature is kept in a cabinet due to limited quantities of the literature. (<u>Id.</u>, p. 22.) Defendants state that Hare Krishna religious educational pamphlets and documents are available at the Chapel. (<u>Id.</u>) Second, Defendants assert that MOCC is "equitable in what it offers various faith groups for fast and holy days." (<u>Id.</u>) Defendants explain that MOCC "does not accommodate personal fasts in any special way, but various groups – including Hare Krishna faith – are provided a special feast meal once a year." (<u>Id.</u>) Additionally, Defendants state that "Hare Krishna devotees, like inmates of other beliefs, are not prohibited from celebrating any special days in an appropriate manner (praying, chanting, etc.) even though special foods are not provided." (<u>Id.</u>) Third, Defendants argue that Plaintiffs have not been prevented from participating in Sankirtana rehabilitative programs. (<u>Id.</u>, p. 23.) Defendants state that "[t]o the extent an approved national Hare Krishna ministry would desire to plan and present an event, such is done by the Christian group Kairos, such an event would be permitted, subject to security requirements." (<u>Id.</u>) Finally, Defendants state that Plaintiffs are allowed to engage in the following: (1) religious activity through prayer, study of literature, diet, and weekly use of the Chapel for private devotions; (2) the playing of

Hare Krishna videos over the closed circuit televisions on a regular basis; and (3) religious services with members of the Krishna religious community and to receive literature from recognized organization that distribute religious articles and material to Hare Krishna individuals. (Id.)

In Response, Plaintiffs argue that "the Equal Protection Clause provides a means to evaluate evidence of disparate treatment in cases in which prisons provide a religious diet that satisfies religion A but not religion B." (Document No. 91-1, p. 58.) Plaintiffs state that the Christian group Kairos are allowed to participate in a four day long religious retreat that "involves elaborate, sumptuous feasts during each day's service." (Id., p. 54.) Plaintiffs state that Defendants refuse to provide accommodation for Plaintiffs' Hare Krishna holy days, but provide "ample accommodation for Muslim and Christian practitioners' holy days (i.e., Christmas, Easter, Good Friday, Ash Wednesday, Ramadan)." (Id., p. 59.) Plaintiffs continue to argue that "Christians have their literatures on prominent display within the MOCC chapel in open book cases, whereas Hare Krishna books and literatures are regulated to a closed, locked steel filing cabinet." (Id., p. 62.)

The Equal Protection Clause of the Fourteenth Amendment provides that "all persons similarly situated should be treated alike." Denying the adherents of one religion a basic feature of their religion while granting the same feature to the adherents of another religion is a violation of the Equal Protection Clause. The denial must be intentional and purposeful to be actionable under the Equal Protection Clause. Thus, the question is whether Plaintiffs are being treated differently in the exercise of their religion than others in the exercise of other religions, i.e., whether Plaintiffs are being discriminated against on the basis of their religion. If so, the next

inquiry is whether the disparity in treatment is justified by legitimate penological interests. Morrison v. Garraghty, 239 F.3d 648, 657 (4th Cir. 2001).

The undersigned finds no evidence in the record that Plaintiffs' equal protection rights are being violated. Rather, it is evident that Defendants are accommodating the basic features of Plaintiffs' religious beliefs by providing them with, among other things, a diet in conformity with their beliefs and the opportunity and a place to worship weekly and to read and study their religious texts. It is evident that Defendants attempt to accommodate the features of Plaintiffs' and other inmates' religious beliefs equally. The record does not contain any evidence that Defendants are intentionally and purposefully discriminating against Plaintiffs on the basis of their religious beliefs. Plaintiffs' conclusory claim that they are treated differently than Christian and Muslim inmates is insufficient. Defendants have established that all religious groups are provided only one religious meal or feast per year. Concerning Plaintiffs' claim that they are prevented from engaging in group retreat of prayer and eating during Sankirtana, unlike Christian Kairos, Plaintiffs' claim is without merit. Unlike Plaintiffs' request to lead the Sankirtana event, Defendants explain that the Christian Kairos retreat is presided over by an approved national ministry. Defendants acknowledge that Plaintiffs would be allowed to engage in such an event if it was presided over by an approved national Hare Krishna ministry. Although Plaintiffs state that Hare Krishna literature is not prominently displayed like Christian literature, there is no evidence that the literature is not ready available for distribution. Similar to Christian literature, Hare Krishna literature is readily available. Further, Plaintiffs cannot show that they were intentionally singled out for harsher treatment. Even assuming Hare Krishna devotees could establish that they are treated differently than other religious groups, for the

70

reasons explained above, such differential treatment is justified by legitimate penological interest. See Morrison v. Garraghty, 239 F.3d 648, 655 (4th Cir. 2001)(*citing*, Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 136, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence."). Therefore, the undersigned respectfully recommends that Defendants be granted summary judgment as to Plaintiffs' Equal Protection claim.

**10.** **Eighth Amendment:**

In their Complaint, Plaintiffs allege that Defendants subjected them to cruel and unusual punishment by providing them food that was unacceptable for Hare Krishna devotees. (Document No. 25, p. 38.) Specifically, Plaintiffs allege that they sustained physical illness because they had to eat food that was repugnant to them. (Id.)

In their Motions, Defendants argue that "Defendants did not engage in cruel and unusual punishment in violation of Plaintiffs' constitutional rights under the Eighth Amendment." (Document No. 70-1, pp. 23 - 26.) Defendants first explain that "Hare Krishna devotees are provided with a vegetarian, non-flesh, diet which excludes the presence of meat, fish, eggs and their byproducts, in keeping with their religious beliefs and as overseen by a dietician." (Id., p. 24.) Defendants note that the above food service complies with the obligation to provide 3,000 to 3,4000 calories per day. (Id., pp. 24 - 25.) Finally, Defendants argue that "there is no indication that the complained-of actions have resulted in any injury, much less a serious or significant injury." (Id., p. 25.) Therefore, Defendants conclude that "Plaintiffs cannot succeed on their Eighth Amendment claim because they cannot demonstrate that Defendants failed to provide

them with food that was adequate in quantity or nutritional value or that they have sustained a serious or significant injury." (Id., p. 26.)

In Response, Plaintiffs conclude that they "have continually and repeatedly suffered serious and significant injury as a result of the policies and actions of Defendants." (Document No. 91-1, p. 44.) Plaintiffs state that they suffered "severe physical, mental, emotional, and spiritual pain." (Id., pp. 44 and 49.)

As a general matter, the Eighth Amendment prohibits punishments which "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Thus, under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.")', quoting Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). The Eighth

Amendment "does not mandate comfortable prisons." <u>Rhodes v. Chapman</u>, 452 U.S. at 349, 101 S.Ct. at 2400. "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." <u>Id.</u> at 347, 101 S.Ct. at 2399; <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995), <u>citing</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); <u>Lopez v. Robinson</u>, 914 F.2d 486, 490 (4th Cir. 1990). To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard, and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. <u>Wilson v. Seiter</u>, 501 U.S. 294, 297-99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities." <u>Id.</u> at 298, 111 S.Ct. 2321 (<u>citing</u> <u>Rhodes v. Chapman</u>, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995)(<u>quoting</u> <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). <u>See also</u> <u>White v. Gregory</u>, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") Therefore, Plaintiffs must allege and eventually establish a "sufficiently serious" deprivation of the conditions of their confinement resulting in "serious or significant physical or mental injury" in order to maintain and prevail

upon their Eighth Amendment claim.

First, the undersigned finds there is no indication that Defendants' conduct and/or policies impacted Plaintiffs' exercise of their religious beliefs resulting in a sufficiently serious deprivation of a basic human need such that an Eighth Amendment violation is implicated. Additionally, Plaintiffs have failed to allege any injury resulting from the challenged conditions. Strickler, 989 F.2d at 1381(an inmate "must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions."); see also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1993)(prisoner's Eighth Amendment claim should be dismissed if he fails to allege a serious physical or mental injury resulting from the conditions of confinement). Although Plaintiffs state that they have suffered severe physical pain, such a conclusory statement is inadequate. Plaintiffs fail to allege any facts supporting the existence of a physical injury as the result of Defendants' conduct. Plaintiffs' allegation of physical pain is insufficient because physical pain alone is considered an emotional injury. See Calderon v. Foster, 2007 WL 1010383, * 8 (S.D.W.Va. March 30, 2007)(J. Johnston). Plaintiffs further claim that they suffered severe "mental, emotional, and spiritual pain." The PLRA expressly prohibits the filing of civil actions by prisoners "confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Although the PLRA does not define "physical injury" and the Fourth Circuit has not provided a definition, other courts have held that the "physical injury" need not be significant, but it must be more than de minimis. See Flanory v. Bonn, 604 F.3d 249, 254 (6th Cir. 2010); Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312-13 (11th Cir. 2002); Siglar v. Hightower, 112 F.3d 191 (5th Cir. 1997); Zehner v. Trigg, 952 F.Supp. 1318

(S.D. Ind. 1997). As stated above, at most Plaintiffs have alleged only a *de minimis* injury. Therefore, the undersigned respectfully recommends that Defendants be granted summary judgment as to Plaintiffs' Eighth claim.

**11.     Plaintiff Rose's Motion for Preliminary Injunction:**

In his Motion, Plaintiff Rose requests that this Court direct Defendants to provide him with a single cell. (Document No. 168.) Plaintiff Rose explains that he is entitled to a single occupancy cell because he is classified as a sexual predator. (Id.) Plaintiff Rose states that he is 56 years old and was sentenced to approximately 220 years in prison. (Id.) Plaintiff, therefore, argues that "due to [his] crime and time of sentence and classification, [he] is supposed to be in a single occupant cell." (Id.)

In Response, Defendants state that they believe Plaintiff Rose incorrectly filed his Motion in the instant action. (Document No. 174.) To the extent Plaintiff intended to file the Motion in this action, Defendants argue that he is not entitled to "file it within the confines of an existing unrelated civil action in an attempt to avoid the requirements of paying filing fees and undergoing screening by a judge." (Id.)

The Court agrees with Defendants that Plaintiff Rose's request for an injunction is completely unrelated to the allegations asserted in Plaintiffs' Complaint. Accordingly, the undersigned respectfully recommends that Plaintiff Rose's Motion for Injunction be denied. To the extent Plaintiff Rose wishes to assert the above claim, Plaintiff may initiate a new action by filing a Complaint with this Court.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court

confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** Plaintiff Lennis Angel's "Request to Withdraw From Above-Styled Case" (Document No. 139), **GRANT** Plaintiff Donald Wilson's "Motion To Be Removed From Lawsuit" (Document No. 211), **GRANT** Plaintiff David Plumley's "Motion to Withdraw" (Document No. 217), **CONSTRUE** Defendants' Motions to Dismiss as Motions for Summary Judgment and **GRANT** the Motions for Summary Judgment (Document Nos. 69 and 108), **DENY** Plaintiffs' Motion for Summary Judgment (Document No. 135), **DENY** Plaintiff Rose's Motion for Injunctive Relief (Document No. 168), **DISMISS** Plaintiffs' Complaint (Document No. 25) and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the Plaintiff shall have seventeen (17) days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727

F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Johnston and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: April 5, 2016.

Omar J. Aboulhosn
United States Magistrate Judge